312 Ga. 727
FINAL COPY

S21A0627.  COLLINS v. THE STATE.
S21A0628.  BURDINE v. THE STATE.
S21A0629.  LOVE v. THE STATE.

WARREN, Justice.

Jalin Collins, Percy Burdine, and Brandon Love were tried together and convicted of murder and other offenses in connection with the shooting death of Milton Carl Kelley.[1]  Although the three

---

[1] Kelley was killed on April 21, 2012.  After the three co-defendants were first indicted and a demurrer was filed, a Cobb County grand jury re-indicted all three co-defendants on May 31, 2013, for malice murder, felony murder predicated on aggravated assault with a deadly weapon, felony murder predicated on aggravated assault with intent to rob, felony murder predicated on conspiracy to possess more than one ounce of marijuana, aggravated assault with a deadly weapon, aggravated assault with intent to rob, possession of a firearm during the commission of a felony, and possession of less than one ounce of marijuana.  Burdine alone was indicted for felony murder predicated on possession of a firearm by a convicted felon, and Collins alone was indicted for felony murder predicated on possession of a firearm by a first-offender probationer.

At a joint trial held from October 21 to 31, 2013, a jury found Love guilty of all crimes with which he was charged; found Collins not guilty of malice murder but guilty of all the other crimes with which he was charged; and found Burdine not guilty of malice murder, felony murder predicated on possession of a firearm by a convicted felon, aggravated assault with a deadly weapon, and possession of a firearm during the commission of a felony, but guilty of all the remaining crimes with which he was charged.  On November 4, 2013, the trial court sentenced all three co-defendants to life in prison for murder (Love for malice murder, and Collins and Burdine for felony murder predicated on

co-defendants raise different contentions on appeal, their appeals have been consolidated for purposes of issuing an opinion. Burdine contends that the evidence was insufficient to sustain his convictions; that the trial court erred by denying his motion for a separate trial, by improperly modifying a pattern jury instruction, by failing to properly address a question the jury asked during deliberations, and by sentencing him based on an inconsistent verdict; and that his trial counsel provided constitutionally ineffective assistance. Collins contends that the trial court committed plain error by giving the jury an inapplicable instruction

---

aggravated assault with a deadly weapon), a consecutive term of 20 years for aggravated assault with intent to rob, and time served for possession of less than one ounce of marijuana. The trial court also sentenced Collins and Love to a consecutive term of five years for possession of a firearm during the commission of a felony. The other felony murder counts were vacated by operation of law, and the trial court merged the remaining count of aggravated assault with a deadly weapon into the murder convictions. After the convictions, an order of nolle prosequi was entered on the co-defendants' first indictment.

All three co-defendants timely filed motions for new trial, which were amended through new counsel on various dates in 2017 and 2019. After hearings in 2019, the trial court denied the amended motions in separate orders entered on January 10, 2020, and each co-defendant timely filed a notice of appeal. The cases were docketed in this Court to the April 2021 term. Collins's case was orally argued on April 22, 2021, and Burdine's and Love's cases were submitted for decisions on the briefs.

on the definition of "accomplice" and that his trial counsel provided constitutionally ineffective assistance.[2] Love contends that the trial court erred by denying his request for a jury instruction on voluntary manslaughter. For the reasons explained below, we affirm the convictions in all three cases.

1. Viewed in the light most favorable to the verdicts, the evidence presented at the co-defendants' trial showed the following.[3]

---

[2] At oral argument, Collins also asserted that, although the count of aggravated assault with a deadly weapon was merged into his conviction for felony murder predicated on the same aggravated assault, the count of aggravated assault with intent to rob also should have been merged into the felony-murder conviction. But under our settled precedents — which Collins has not cited — aggravated assault with intent to rob does not merge into felony murder predicated on aggravated assault with a deadly weapon, and the trial court therefore did not err in sentencing Collins for both offenses. See *Norris v. State*, 302 Ga. 802, 805 (809 SE2d 752) (2018) (citing *Thomas v. State*, 292 Ga. 429, 433 (738 SE2d 571) (2013)); *Dublin v. State*, 302 Ga. 60, 68 (805 SE2d 27) (2017). See also *Hinton v. State*, 304 Ga. 605, 608-609 (820 SE2d 712) (2018) (when the trial court exercises its discretion "to sentence the defendant on a felony murder count predicated on one crime, then it must also sentence him on any remaining crime that served as a predicate to a vacated felony murder count when the other crime does not merge with the felony murder conviction on which a sentence was entered") (citation and punctuation omitted). Cf. *Rice v. State*, 311 Ga. 620, 625 (857 SE2d 230) (2021) (on which Collins relies, but which vacated a conviction for an aggravated assault that should have been merged into a conviction for attempted armed robbery).

[3] Of the three co-defendants, only Burdine raises the sufficiency of the evidence on appeal, and he raises that issue as to all of his convictions except one (possession of less than one ounce of marijuana). Under *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020), we no longer as a matter of course

Collins and Burdine lived in a three-bedroom duplex apartment, and Love stayed there often, spending several nights at the apartment leading up to April 21, 2012. On that day, Angela Smallwood, Angela Peace, and Michele Black were visiting Sheree Christiansen, who lived in the apartment adjoining Collins and Burdine's apartment. During the afternoon, Black overheard all three co-defendants on the front porch planning to rob someone. At some point on the same day, Black saw Love with a 9-millimeter pistol and Collins with some type of revolver that had been "extended" and looked like a "sawed-off" rifle. That evening, Smallwood and Peace agreed to give Collins and Love a ride in Smallwood's car to purchase some marijuana, and they saw Collins or Love with a handgun. Burdine followed in Collins's pickup truck, giving Collins and Love directions to Kelley's house. Burdine turned "away from" Smallwood's car, Collins and Love directed Smallwood to park on a

consider sufficiency of the evidence sua sponte in non-death penalty cases. Therefore, although we will consider Burdine's contention of evidentiary insufficiency, we will not evaluate the sufficiency of the evidence to support Collins's or Love's convictions, or Burdine's conviction for possession of less than one ounce of marijuana.

cul-de-sac with no houses, and Collins and Love exited Smallwood's car. The location where Smallwood parked was about 200 to 300 yards from Kelley's house. Around 10:30 p.m., Kelley's girlfriend heard a loud noise outside their home, went outside to check on Kelley, and found him lying on the garage floor with a gunshot wound to his face.

About 20 minutes after Collins and Love arrived at the cul-de-sac, they ran back to Smallwood's car, breathing heavily and telling her to "go, go, go"; one of them said not to ask any questions. Upon their return to the duplex, Collins and Love first went to Collins and Burdine's side of the duplex and then about 30 minutes later to Christiansen's side. Christiansen saw Collins and Love burning their clothes in the back yard. Black saw the two men place guns in Christiansen's attic. Collins and Love smoked marijuana with Smallwood and Peace. Love later told Smallwood and Peace that he and Collins had shot a man in the face in self-defense, and also told them not to tell the police. Black heard Love say that he thought he had murdered somebody, and Collins became "very angry" and told

Love to "shut up."

When police officers responded to the 911 call from Kelley's girlfriend, they discovered that Kelley was dead. The medical examiner testified that the cause of Kelley's death was a gunshot wound to his left-eye region from a very close range, about seven inches away. Officers found a 9-millimeter shell casing in the garage, but no firearms around the body or in the house. According to Kelley's girlfriend and son, Kelley was opposed to firearms and never owned or possessed any. Although Kelley repaired cars and worked as a landscaper, he also sold marijuana to "older people" he knew and to Burdine. But Kelley began to ignore Burdine's attempts to contact him, and their relationship had soured.

The day after the shooting, Love used Christiansen's phone to call his mother in Chicago and tell her that he needed money to get to Chicago because he thought he had killed someone. Black and Christiansen spoke with Kelley's son and realized that Kelley was probably the murder victim Love had talked about. Black and Christiansen then spoke with law enforcement officers and were

6

able to give them information about the shooting that had not been made public yet. Police officers executed a search warrant and found marijuana in Collins and Burdine's apartment.

Detectives interviewed all three co-defendants, beginning with Collins, who at first denied — but later admitted — that he had a cell phone and confirmed the number. Collins denied any involvement in Kelley's murder and said that he had been at home all day, went to his girlfriend's house that evening, and stayed there for the rest of the night. Burdine also denied any involvement in the murder, saying that he had been home all day and night, although he may have gone to a nearby drugstore at some point. Burdine admitted that he occasionally purchased marijuana from Kelley, and that he called and texted Kelley for that purpose on April 21, but that Kelley responded that he had company and it "wasn't going to work out." Burdine also claimed that he tried to contact Kelley the next morning by text.

Cell phone logs and records showed that one of the last calls on Kelley's phone was from Burdine's phone at 10:05 p.m. on the night

of Kelley's murder and that, contrary to Burdine's statement, Burdine did not call or text Kelley's phone the next morning. However, records showed that all text messages on Burdine's cell phone from the week preceding the murder through April 21 had been deleted. Cell phone location data showed that both Collins's and Burdine's phones moved toward the area of Kelley's house shortly before the murder and back to the area of the duplex after the murder. During the 10:05 p.m. call from Burdine's phone to Kelley's phone and a call from Collins's phone to Burdine's phone right after that, both Collins's and Burdine's phones were signaling off a cell tower near Kelley's house, and Collins's phone continued to signal off that tower as he sent text messages to his girlfriend from 9:56 p.m. to 10:27 p.m. that night. Records also showed that Collins and his girlfriend sent 63 text messages to each other between 8:00 p.m. on April 21 and 3:00 a.m. on April 22, and Collins's girlfriend later admitted that Collins would not have texted her so many times if he had been with her that night.

Love also initially denied any involvement in the murder,

8

telling detectives that he had been with Black at Christiansen's apartment on the evening of the murder and all the rest of that night. When Love was told that there were surveillance cameras outside Kelley's house and that Smallwood had told detectives "what happened that night," Love admitted that he had a "pirate gun" that was long with a small scope, and he also mentioned a 9-millimeter pistol. Love claimed that he discarded the "pirate gun" in a yard before walking from Smallwood's car to Kelley's house for what was "supposed to be a drug deal, and at some point . . . turned into a robbery" because Kelley had cash or marijuana, and that the "two Angies" did not know what was going to happen. Love also claimed that he "blacked out" as he approached Kelley's house, but he recalled seeing either a quarter pound or half pound of marijuana back at the duplex after leaving Kelley's house.

At trial, Love testified that he had lied about "blacking out"; that Burdine was going to buy marijuana from Kelley but did not do so because Kelley told him he had company; that Love and Collins decided to talk to Kelley themselves; that Collins stopped at the end

9

of the driveway and Love approached Kelley while Kelley was doing something at the trunk of a car; that Kelley then closed the trunk; that after Love and Kelley briefly discussed why Love was there, Kelley pulled a 9-millimeter pistol on Love, who was unarmed; that Love was able to grab the pistol and point it at Kelley's head; that Kelley demanded his pistol back and threatened to kill Love; that Kelley moved in a way that scared Love; and that Love then shot Kelley in self-defense.

*S21A0628. Burdine v. The State*[4]

2. Burdine contends that the trial court erred in denying his motion for directed verdict, because the evidence was insufficient to support his convictions as a party to the crimes of felony murder predicated on aggravated assault with a deadly weapon and aggravated assault with intent to rob.[5] In reviewing a denial of a

---

[4] We note that Divisions 2 through 5 of this opinion address claims that Burdine alone raises on appeal, and that his claims of ineffective assistance of counsel — as well as Collins's — are addressed below in Division 8.

[5] Burdine also contends that the evidence was insufficient to support the verdicts on the other two felony murder counts of which he was found guilty, but that contention is moot because he was not sentenced on those counts. See *Blackshear v. State*, 309 Ga. 479, 482 (847 SE2d 317) (2020).

motion for directed verdict, we apply the familiar standard set forth by *Jackson v. Virginia,* 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979): "'Whether the evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that (the defendant) was guilty of the crimes for which he was convicted.'" *Boyd v. State*, 306 Ga. 204, 212 (830 SE2d 160) (2019) (citation omitted). The evidence presented at trial against Burdine meets that standard.

(a) With respect to his conviction for felony murder predicated on aggravated assault with a deadly weapon, Burdine contends that there was no evidence he had any knowledge that Love or Collins possessed a firearm when they left the duplex for Kelley's house, that Love or Collins had any plan to commit an assault on Kelley with a firearm, or that such an assault was a foreseeable possibility. Though Burdine acknowledges that evidence was presented that Love or Collins was seen in possession of a firearm before leaving for Kelley's house, Burdine argues that the evidence shows that those "sightings of a possible firearm" occurred when Burdine had already

11

left the duplex and therefore no longer was present to see any weapons.

To support Burdine's conviction for felony murder, the evidence had to show that Burdine proximately caused, either directly or as a party to the crime, Kelley's death while in the commission of an aggravated assault with a deadly weapon. See OCGA § 16-5-1 (c); *Boyd*, 306 Ga. at 207. The trial court charged the jury on aggravated assault, which OCGA § 16-5-21 (a) (2) defines as "assault[ ] . . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]" The trial court also charged the jury on Georgia's "party to a crime" statute, which provides that "[e]very person concerned in the commission of a crime[,]" including one who "[d]irectly commits the crime" or "[i]ntentionally aids or abets in the commission of the crime" is "a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a), (b) (1), (3). "Conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the

principal perpetrator of the crime, which may be inferred from presence, companionship, and conduct before, during, and after the offense." *Hood v. State*, 309 Ga. 493, 498 (847 SE2d 172) (2020) (citation and punctuation omitted).

Even if Burdine had no knowledge that Love or Collins possessed the gun that was used to commit an aggravated assault against Kelley, Burdine still could be a party to the aggravated assault if he shared a criminal intent to commit an assault on Kelley. See *Herrington v. State*, 300 Ga. 149, 151 (794 SE2d 145) (2016) ("[E]ven a defendant who lacks knowledge that his co-defendant possessed the gun that was used to commit an aggravated assault may nevertheless be a party to the aggravated assault, if he shared a criminal intent to commit an assault on the victim.") (citation and punctuation omitted). And if the evidence showed such a shared criminal intent, then Burdine was "chargeable with the foreseeable acts undertaken by [Love and Collins] in the furtherance of that shared intent," even if Love or Collins "did something or employed some instrument that [Burdine] subjectively did not expect." *Cash*

13

*v. State*, 297 Ga. 859, 864 (778 SE2d 785) (2015).

Here, the evidence showed that Burdine was present with Love and Collins for the planning of the robbery and that he was the one who knew Kelley, called Kelley, and followed Love and Collins in Collins's truck to the area near Kelley's house while giving directions. The evidence was sufficient for the jury to conclude that Burdine shared a criminal intent with Love and Collins, and that Burdine conspired to commit and, at the very least, was a party to the planned robbery. Indeed, even assuming that Burdine did not know that Love or Collins had a gun or planned to use a gun to rob or assault Kelley, the jury was authorized to hold Burdine criminally responsible for Kelley's death because there was a foreseeable risk that Love or Collins would bring a firearm to the planned robbery of Kelley, and that Kelley — the intended victim of a robbery — could be killed. See, e.g., *Kemp v. State*, 303 Ga. 385, 389 (810 SE2d 515) (2018) (rejecting an argument nearly identical to Burdine's and affirming that the defendant could be responsible for his co-defendant's actions as a party to the crime "because it was a

14

reasonably foreseeable consequence that the intended victim of a robbery would be killed"); *Cash*, 297 Ga. at 864 ("Even assuming that the appellant did not know that [his co-defendant] was armed with a shotgun, it certainly is foreseeable that an assault in the circumstances presented here — an early-morning ambush on the side of a road to which the victims were lured unwittingly — might involve the use of a deadly weapon and may result in serious injury or loss of life.").

(b) With respect to his conviction for aggravated assault with intent to rob, Burdine argues that without certain allegedly inadmissible hearsay to which his trial counsel failed to object, there was no evidence that Burdine or his co-defendants had any intent or plan to rob Kelley.[6] In Division 8 (c) below, we address Burdine's claim of ineffective assistance of counsel for failure to object to this

---

[6] An additional argument that Burdine makes — that the evidence does not prove that a robbery even occurred because the lead detective testified that there was no evidence that any items were stolen from Kelley's house — is wholly without merit. See OCGA § 16-5-21 (a) (1); *Lucky v. State*, 286 Ga. 478, 482 (689 SE2d 825) (2010) ("[T]hat property be taken . . . is not a fact which must be proved in aggravated assault with intent to rob.").

15

alleged hearsay, but that claim does not affect our review of the sufficiency of the evidence. "When we consider the legal sufficiency of the evidence under *Jackson v. Virginia*, we consider all the evidence presented at trial, without regard to whether some of that evidence might have been improperly admitted." *Golden v. State*, 310 Ga. 538, 540 (852 SE2d 524) (2020) (citation and punctuation omitted). Likewise, this Court is authorized to consider hearsay evidence on a sufficiency review even if a competent attorney would have objected to that hearsay evidence and the evidence would have been excluded at trial as a result. See *Mosley v. State*, 307 Ga. 711, 718 n.2 (838 SE2d 289) (2020); *Dublin v. State*, 302 Ga. 60, 67-68 (805 SE2d 27) (2017).

Accordingly, we conclude that the evidence presented at trial, when viewed in the light most favorable to the verdicts, was sufficient to authorize a rational jury to find Burdine guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson*, 443 U.S. at 319; *Hood*, 309 Ga. at 494-498 (evidence supported convictions for felony murder and aggravated assault

16

where it showed, among other things, that the defendant participated in a plan to rob the victims, called the victims multiple times including just before the shooting, was in regular phone contact with a co-indictee, and met with her co-indictees afterward).

3. Burdine contends that the trial court erred in failing to vacate his conviction for felony murder predicated on aggravated assault with a deadly weapon because it was based on the same facts as the malice-murder count (of which he was found not guilty), and because he also was found not guilty of the separate predicate offense of aggravated assault with a deadly weapon. In short, he contends that his felony-murder conviction was inconsistent with the not-guilty verdicts the jury returned on the counts of malice murder and aggravated assault with a deadly weapon.

Consistent with United States Supreme Court precedent, however, this Court abolished the inconsistent-verdict rule in 1986. See *McElrath v. State*, 308 Ga. 104, 109 (839 SE2d 573) (2020) (noting that *Milam v. State*, 255 Ga. 560, 562 (341 SE2d 216) (1986), "abolished the rule that inconsistent verdicts in irreconcilable

17

conflict in criminal cases warranted reversal, adopting the rationale set out by the U. S. Supreme Court in *United States v. Powell*," 469 U.S. 57, 64-65 (105 SCt 471, 83 LE2d 461) (1984)) (citations and punctuation omitted). Burdine acknowledges that we recently applied *Milam* to uphold a felony-murder conviction even though the defendant — like Burdine — had been found not guilty of malice murder. See *Dugger v. State*, 297 Ga. 120, 122 (772 SE2d 695) (2015). See also *Smith v. State*, 280 Ga. 340, 340 (627 SE2d 1) (2006) (expressly declining to overrule *Milam* and rejecting as meritless the assertion that a felony murder conviction had to be reversed because it was inconsistent with an acquittal on the predicate offense of aggravated assault). Burdine nonetheless asks us to revisit *Dugger* and other similar precedents allowing for inconsistent verdicts, claiming that they "deprive defendants of their protections against double jeopardy and of due process." But he does not offer any compelling reason to abandon precedent that has been a settled part of our law for 35 years, is straightforward in its application, and not obviously unsound. See *Smith v. State*, 295

18

Ga. 120, 122 (757 SE2d 865) (2014) (conducting a similar stare decisis analysis of the rule that "the State may insist that an accused be tried by a jury, even when the accused would prefer to be tried by a judge," id. at 120). See also *McElrath*, 308 Ga. at 108-109 ("'[I]nconsistent verdicts — even verdicts that acquit on a predicate offense while convicting on the compound offense — should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.'") (quoting *United States v. Powell*, 469 U.S. 57, 65 (105 SCt 471, 83 LE2d 461) (1984)); *Dugger*, 297 Ga. at 122 (concluding that a not-guilty verdict on malice murder is not "necessarily inconsistent" with a guilty verdict on felony murder, "because a jury is clearly authorized to find a defendant guilty of felony murder even where it finds that a defendant did not possess the requisite 'malice' to sustain a malice murder conviction") (citation and punctuation omitted).

19

4. Burdine contends that the trial court erroneously denied his motion to sever his trial from the trial of his co-defendants. We conclude that the trial court did not abuse its discretion in denying a severance of Burdine's trial.

"When two or more defendants are jointly indicted" for a capital felony where the State does not seek the death penalty, or for a non-capital offense, "such defendants may be tried jointly or separately in the discretion of the trial court." OCGA § 17-8-4 (a). In ruling on a motion to sever, a trial court should consider: "(1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses." *Smith v. State*, 308 Ga. 81, 85 (839 SE2d 630) (2020) (citation and punctuation omitted). Neither the "mere presence of antagonistic defenses" nor the "possibility that a separate trial would give a defendant a better chance of acquittal" is sufficient to show an abuse of discretion. Id. (citation and punctuation omitted). "Rather, the defendant bears the burden of showing that a joint trial was so

20

prejudicial as to amount to a denial of his right to due process." Id. (citation and punctuation omitted). In accordance with OCGA § 17-8-4 (a), "we review a trial court's decision to deny a severance motion for an abuse of discretion." *Draughn v. State*, 311 Ga. 378, 386 (858 SE2d 8) (2021).

Burdine argues that in light of the factors the trial court should have considered, severance was required.[7] We address each factor in turn. With respect to the first factor — likelihood of confusion of the evidence and law — Burdine conceded at the hearing on his motion to sever that confusion of the evidence and the law would be

---

[7] In arguing that the trial court abused its discretion by not severing his trial, Burdine also points to certain other of his enumerations of trial-court error and ineffective assistance of counsel, arguing that they "stem from" the denial of his motion to sever and that they prejudiced him and caused confusion of the factual and legal issues at trial. However, our review of the trial court's order denying severance of Burdine's trial does not ask whether there was some other error that would not have occurred at a separate trial, but rather whether the joint trial — in light of the factors that the trial court should have considered — prejudiced Burdine to such an extent as to amount to a denial of due process. See *Smith*, 308 Ga. at 85; *Kennedy v. State* 253 Ga. 132, 134 (317 SE2d 822) (1984) ("The exercise of a trial court's discretion in denying a motion to sever will not be disturbed on appeal unless the defendant clearly demonstrates that he suffered prejudice *by one or more of the above factors* amounting to a denial of due process.") (emphasis supplied).

unlikely if his trial were not severed from the trial of his co-defendants.[8]  Indeed, such confusion was unlikely because the three co-defendants were "charged with the same offenses stemming from the same incident with largely the same evidence" and the jury was "instructed to determine guilt or innocence of each defendant separately."  *Draughn*, 311 Ga. at 387.  Moreover, the verdicts showed that the jury distinguished Burdine's culpability from that of his co-defendants because Burdine was found not guilty of malice murder, felony murder predicated on possession of a firearm by a convicted felon, aggravated assault with a deadly weapon, and possession of a firearm during the commission of a felony, but Love was found guilty of all counts and Collins was found guilty of all counts except malice murder.  See *Virger v. State*, 305 Ga. 281, 291 (824 SE2d 346) (2019) (concluding that the trial court did not abuse its discretion in denying a motion for severance, due in part to the fact that "the jury's verdicts show that they distinguished between

---

[8] Burdine's counsel stated: "First one is, will the number of defendants create confusion regarding law and evidence presented against each individual defendant?  I'm gonna give this one to the State and say no."

[the two co-defendants as to] culpability, because [one co-defendant] was acquitted of malice murder, two counts of felony murder, and aggravated battery, while the jury found [the other] guilty on all counts").

With respect to the second factor — the possibility that evidence against one defendant may be considered against the other defendant — Burdine argues that certain evidence admitted against Collins and Love may have been considered improperly against Burdine. But testimony from multiple witnesses at trial showed the distinct roles each co-defendant played in planning to rob Kelley and causing his death, and the jury was properly "charged on party to a crime — as well as mere association and mere presence — for all three co-defendants and returned separate verdicts for each defendant." *Smith*, 308 Ga. at 86. Moreover, "[t]he trial court provided the jury with limiting instructions on each of the few occasions that evidence against one of the co-defendants was inadmissible against the other, and the jury is presumed to have followed those instructions." *Virger*, 305 Ga. at 290-291.

Finally, with respect to the third factor — the presence or absence of antagonistic defenses — Burdine complains that Love's defense, which consisted of Love's trial testimony against the backdrop of Love's inconsistent pre-trial statements, was antagonistic to Burdine's defense. But the mere antagonism between Burdine's and Love's defenses is not sufficient to amount to a denial of due process, even if the evidence against Love was stronger than the evidence against Burdine and even if a separate trial potentially could have increased Burdine's chance of acquittal. See *Hurston v. State*, 310 Ga. 818, 826 (854 SE2d 745) (2021) ("[T]he mere presence of antagonistic defenses is insufficient to require severance in a non-death penalty case; instead, the defendant must show that considering these antagonistic defenses, a joint trial was so prejudicial as to amount to a denial of his right to due process.") (citation and punctuation omitted); *Smith*, 308 Ga. at 85-87 ("[T]he fact that the evidence as to one of the co-defendants is stronger does not demand a finding that the denial of a severance motion is an abuse of discretion, where there is evidence showing that the

defendants acted in concert.") (citation and punctuation omitted).

In sum, we have already held that sufficient evidence was introduced at trial to show that Burdine was guilty as a party to the crimes for which he was convicted, and "[w]here, as here, there is sufficient evidence of a 'common scheme or plan' to commit a criminal offense, joinder is authorized and severance is not mandatory." *Green v. State*, 302 Ga. 816, 819 (809 SE2d 738) (2018) (citation and punctuation omitted). For these reasons, we conclude that the trial court did not abuse its discretion in denying Burdine's motion to sever. See *Draughn*, 311 Ga. at 386.

5. Burdine contends that the trial court erred in instructing the jury, contrary to the pattern jury instruction, that an out-of-court statement by a testifying co-defendant could be used against Burdine. However, because Burdine's attorney did not object to this instruction at trial, we review this enumeration for plain error only. See *Lewis v. State*, 311 Ga. 650, 664 (859 SE2d 1) (2021). Accordingly, the alleged instructional error requires reversal only if it "was not affirmatively waived; was clear and obvious, rather than

25

subject to reasonable dispute; likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Knighton v. State*, 310 Ga. 586, 591 (853 SE2d 89) (2020). "An appellant must establish all four elements of the test in order to demonstrate plain error, so satisfying this test is difficult, as it should be." Id. (citations and punctuation omitted).

During its charge to the jury, the trial court twice gave the pattern jury instruction regarding the statement of a defendant at a joint trial as follows:[9]

> Any out-of-court statement made by one of the defendants on trial in this case after the alleged criminal act has ended may be considered only against the defendant who made the statement and only if you find that such statement was freely and voluntarily made. If you find that an out-of-court statement was made to the police freely and voluntarily by a defendant on trial in this case, then you are to consider the statement only as against the particular defendant who made it.

---

[9] We note that at the time of trial, this charge was provided in duplicate in the suggested pattern charges, and that the trial court gave the charge twice at trial—apparently tracking the duplicated pattern charge. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.93 (B) (4th ed. 2007); id. at § 1.33.10 (removed from the pattern instructions before the 2013 trial, but requested by both parties at trial).

At the conclusion of this instruction the first time, the trial court added: "An in-court statement is not subject to this limitation, nor is an out-of-court statement if the defendant testifies." At the conclusion of this instruction the second time, the trial court added: "unless the defendant testifies."

On appeal, Burdine makes no argument about how the trial court's jury instructions amounted to plain error. Instead, he offers only the conclusory assertion — unsupported by citation to legal authority — that the language the trial court added to the end of each pattern instruction allowed Love's out-of-court, post-arrest statements to be used against Burdine and "totally stripped" Burdine of the "rights of confrontation and fair trial" that must be protected "with the proper limiting instruction to guide the jury's consideration of a co-defendant's post-arrest statement."[10]

---

[10] Burdine does not claim that the alleged violation of his right to a fair trial was independent from the alleged violation of his right to confrontation. Nor does he make any attempt to distinguish his rights arising under the Georgia Constitution from his rights arising under the United States Constitution. As a result, we do not conduct separate analyses, either. See *Burney v. State*, 309 Ga. 273, 282 n.6 (845 SE2d 625) (2020).

27

But Burdine has made no such showing. To the contrary, because the record shows that Love testified and was subject to cross-examination, Burdine has failed to show that the trial court's instructions violated his confrontation rights by allowing Love's pre-trial statements to be used against Burdine. See, e.g., *Wells v. State*, 307 Ga. 773, 776 (838 SE2d 242) (2020) (the defendant's claim "that the trial court's admission of inculpatory statements from [his] co-indictee . . . violated his right of confrontation" was rejected because the co-indictee "testified at [the defendant's] trial and [the defendant] was able to cross-examine him"). Accordingly, Burdine has failed to demonstrate error, let alone plain error. See, e.g., *Thrift v. State*, 310 Ga. 499, 507 n.7, 510 n.8 (852 SE2d 560) (2020); *Russell v. State*, 309 Ga. 772, 783 (848 SE2d 404) (2020).

*S21A0629. Love v. The State*

6. Love's sole contention on appeal is that the trial court erred by denying his request for a jury instruction on voluntary manslaughter as a lesser offense of murder. His contention fails because the evidence did not support such an instruction.

28

OCGA § 16-5-2 (a) defines "voluntary manslaughter" as the killing of another person under circumstances that would otherwise be murder when the killer "acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]" To warrant a jury charge on voluntary manslaughter, there must be at least slight evidence that "the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself." *Beck v. State*, 310 Ga. 491, 496 (852 SE2d 535) (2020) (citations and punctuation omitted). "A charge on voluntary manslaughter is not available to a defendant whose own statement unequivocally shows that he was not angered or impassioned when a killing occurred, and when the other evidence does not show otherwise." Id. at 497 (citation and punctuation omitted). See also *Burke v. State*, 302 Ga. 786, 790-791 (809 SE2d 765) (2018) ("[A]cting out of fear of bodily harm is not the same as acting in the heat of passion, and only evidence of the latter supports a voluntary manslaughter conviction.").

Here, Love argues that his trial testimony supported not only self-defense, but also the theory that Kelley's threatening words, combined with his violent conduct, amounted to a serious provocation that caused Love to react passionately. To that end, Love points to his testimony that Kelley called Love a "mother f\*\*\*er" to his face, threatened to kill him, and pulled a handgun on him. But Love never testified that he was angry or mad or that he had any other response showing he might have reacted passionately — only that he was scared and was defending himself (as well as Collins).[11] Accordingly, Love has not shown that there was the slight evidence required to support a jury charge on voluntary manslaughter, and the trial court did not err in refusing to give such a charge. See *Morton v. State*, 306 Ga. 492, 496 (831 SE2d 740) (2019) (the evidence did not support a charge on voluntary manslaughter where the record was "devoid of any evidence that the

---

[11] Love testified that before he grabbed Kelley's weapon, he "thought about . . . Collins over here," and after Love grabbed the gun and Kelley threatened to kill him, "I just seen him move and I got scared and I shot him." When asked what he thought would happen if he did not fire, Love answered: "I was going to die or he was going to take the weapon. I was just on defense."

shooting was the result of a sudden, violent, and irresistible passion," and the defendant "testified that he shot [the victim] because he was scared and felt he needed to protect himself"); *Allen v. State*, 290 Ga. 743, 746-747 (723 SE2d 684) (2012) (where the defendant "testified at trial that he shot the victim . . . in self-defense when, during a verbal altercation with the victim and another man, the man pointed a gun at him," and the defendant "stated he was 'afraid' and 'terrified' because of the verbal threats the man was making," some evidence was offered that the defendant may have acted in self-defense, but that same evidence did not also constitute evidence that he reacted passionately as required to warrant a charge on voluntary manslaughter).

### *S21A0627. Collins v. The State*[12]

7. Collins contends that the trial court committed plain error when it gave the jury an inapplicable pattern instruction excluding certain witnesses from the definition of "accomplice." Because there

---

[12] We note that Division 7 of this opinion addresses claims that Collins alone raises on appeal, and that his claims of ineffective assistance of counsel —as well as Burdine's — are addressed below in Division 8.

was evidence to support this charge, Collins has failed to show plain error.

To authorize a jury instruction, "there need only be produced at trial slight evidence supporting the theory of the charge." *Hawkins v. State*, 304 Ga. 299, 301 (818 SE2d 513) (2018) (citation and punctuation omitted). "[W]hether the evidence presented is sufficient to authorize a charge is a question of law." *Lofton v. State*, 310 Ga. 770, 789 (854 SE2d 690) (2021) (citation and punctuation omitted). "In considering whether a witness is an accomplice, we look to the definition of party to a crime found in OCGA § 16-2-20." *Horton v. State*, 310 Ga. 310, 322 (849 SE2d 382) (2020) (citation and punctuation omitted). Thus, "[a]n accomplice is someone who shares a common criminal intent with the actual perpetrator of a crime." *Thornton v. State*, 307 Ga. 121, 125 (834 SE2d 814) (2019) (citation and punctuation omitted). "Mere presence or approval of a criminal act is not sufficient to render one a party to the crime, although criminal intent may be inferred from a person's conduct before, during, and after the commission of the crime." Id. (citation and

punctuation omitted).

Moreover, under OCGA § 24-14-8, in "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness . . . ." In order to charge a jury "properly" with respect to this statute, it may be necessary to instruct the jury that a witness whose "participation . . . in the criminal enterprise" was "unknowing" or due to coercion is not an "accomplice" whose testimony must be corroborated. See *Fisher v. State,* 309 Ga. 814, 819 (848 SE2d 434) (2020).

At the charge conference in this case, the trial court decided to give the pattern jury instruction on "unknowing participants" because of the evidence that had been presented about Smallwood and Peace giving Collins and Love a ride to purchase marijuana. After instructing the jury on the legal requirement that the testimony of an accomplice be corroborated, see OCGA § 24-14-8, the trial court added the following: "However, a witness is not an

33

accomplice if the participation by the witness in the criminal enterprise was unknowing. There is no legal requirement of corroboration of a witness whose participation was unknowing." See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.94 (4th ed. 2007, updated through January 2021) (unchanged since the 2013 trial). Collins's counsel never objected to this charge at trial, and Collins concedes on appeal that the charge was a correct statement of law.[13] But he argues that giving the charge was plain error because the evidence mandated a finding that Smallwood and Peace were accomplices whose testimony required corroboration.

To support his argument that the evidence "mandate[d] a finding" that Smallwood and Peace "knowingly participated in th[e] entire criminal enterprise" of "the armed drug deal" and therefore "were accomplices for OCGA § 24-14-8 purposes," Collins points to evidence presented at trial that Smallwood and Peace were involved with Collins and Love in the criminal enterprise of purchasing

---

[13] We note that neither co-defendant objected, and when the trial court stated that it was "going to have to give" the charge at issue, Burdine's counsel said, "Yes. I think you do."

34

marijuana, knew that Collins and Love possessed at least one gun when exiting Smallwood's car to buy marijuana, waited for Collins and Love to return, smoked marijuana with them, discussed Kelley's killing, and not only did not report their knowledge of the homicide to police, but also initially lied to officers during their investigation. But even assuming that there was at least slight evidence presented that Smallwood and Peace were accomplices whose testimony required corroboration — which would have supported the instruction that the trial court gave the jury regarding the legal requirement that the testimony of an accomplice be corroborated — the provision of an accomplice-corroboration jury instruction did not preclude the trial court from also giving a jury charge on a witness's unknowing participation if slight evidence was also introduced to support that theory. See *Hawkins*, 304 Ga. at 301; *Fisher*, 309 Ga. at 819 (although the jury could have found from certain evidence that a witness was an accomplice whose testimony required corroboration, the jury was also authorized, after being properly charged on the need for corroboration of accomplice testimony and

on unknowing participation, to credit other evidence relating to the witness's knowledge and determine that the witness was not an accomplice whose testimony required corroboration). And here, the State introduced at least slight evidence that Smallwood and Peace were unknowing participants: the testimony of Smallwood and Peace, together with one of Love's statements, authorized the jury to conclude that Smallwood and Peace knew only about a plan to purchase marijuana that evening, saw one of the co-defendants with a firearm only before giving them a ride and did not think anything of it, later smoked a small amount of marijuana with the co-defendants, were not initially honest with law enforcement officials but later cooperated with them, and were not present for the crimes and did not know that a robbery, felony drug deal, any other felony, or any use of a firearm was planned. This evidence (even if inconsistent with some other evidence) amounted to at least slight evidence supporting the theory that — although Smallwood and Peace were aware of a planned misdemeanor purchase of marijuana — neither of them shared in the co-defendants' criminal intent to

36

commit a felony or to use a firearm and, therefore, neither Smallwood nor Peace was a party to any of the felonies charged in the indictment.[14] See *Johnson v. State*, 311 Ga. 221, 223-224 (857 SE2d 463) (2021) ("Although the jury could have found that [the witness] was an accomplice, it was also authorized to rely on other evidence, including inconsistencies in [his] and [his girlfriend's] testimony and their statements to the police, to conclude that [the witness] had no knowledge that [the defendant] intended to shoot [the victim], did not share [the defendant's] criminal intent to do so, fled the scene out of fear and surprise, and thus was not an accomplice."). And because there was at least slight evidence that Smallwood and Peace did not have the knowledge necessary to be accomplices, the trial court did not err — let alone plainly err — in giving the jury the pattern charge on unknowing participants.[15] See

---

[14] Moreover, to the extent Smallwood and Peace were accomplices to the charged misdemeanor, their testimony did not have to be corroborated. See OCGA § 24-14-8 (requiring corroboration of accomplice testimony for felonies, but not for misdemeanors).

[15] Collins also argues that the instruction on unknowing participants was misleading and incomplete because it should have defined "criminal

37

*Hawkins*, 304 Ga. at 301; *Russell*, 309 Ga. at 783.

### *Ineffective Assistance of Counsel Claims in S21A0628.  Burdine v. The State and S21A0627.  Collins v. The State*

8.  Burdine and Collins contend in their respective appeals that they each were denied the effective assistance of trial counsel in a number of specific ways.[16]  We conclude that neither Burdine nor

___

enterprise."  But he offers no definition, and there is no pattern charge in that regard.  He instead argues that, to avoid a mistaken belief by the jurors that Smallwood and Peace could not be accomplices if the homicide itself was not discussed beforehand and occurred without their prior knowledge, the instruction could have described specifically what evidence in this case could show that Smallwood and Peace were participants in the criminal enterprise.  But an instruction along those lines would be improper because "a trial court's charge should contain no such summary of the evidence as might to a jury either seem to be an argument or amount to the expression or intimation of an opinion thereon"; "a trial court is not required, even after request, to specifically point out particular evidence in behalf of the defendants which the jury should specially consider"; and a trial court should refuse to give argumentative jury charges that "are more adjusted to the exhortation of counsel than to the impartial clarity which should characterize the instructions of the court." *Chester v. State*, 267 Ga. 9, 12 (471 SE2d 836) (1996) (citations and punctuation omitted).

[16] Burdine also generally contends that an overarching cause of his trial counsel's ineffectiveness was — as counsel testified at the hearing on Burdine's motion for new trial — counsel's "health issues" and "a hearing problem."  To support this general contention, however, Burdine points only to specific instances of alleged deficient performance, which we will address in this division.  See *Williams v. State*, 305 Ga. 776, 782-783 (827 SE2d 849) (2019) (rejecting a general ineffectiveness claim based on trial counsel's inability to hear where the appellant relied on "specific instances of allegedly deficient performance" that this Court separately considered, and where the appellant

38

Collins has shown that his trial counsel was ineffective.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington,* 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. This requires a defendant to overcome the "strong presumption" that trial counsel's performance was adequate. *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015) (citation and punctuation omitted). To carry the burden of overcoming this

---

did not show that his trial counsel entirely failed to subject the prosecution's case to adversarial testing). Burdine does not contend that his trial counsel entirely failed to subject the State's case to meaningful adversarial testing, and so we do not address his general ineffectiveness claim. Cf. id. at 783.

presumption, a defendant "must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Davis v. State*, 299 Ga. 180, 183 (787 SE2d 221) (2016). "In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Id. (citation and punctuation omitted). To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

(a) Burdine contends that his trial counsel was ineffective in failing to object to the jury instruction that an out-of-court statement by a testifying co-defendant could be used against another co-defendant, and Collins contends that his trial counsel was

ineffective in failing to object to the jury instruction on unknowing participants. However, we have already determined, in Divisions 5 and 7 above, that the trial court did not err (as Burdine and Collins allege) in giving the jury instructions that form the bases of these claims. Because objections to these instructions "would have lacked merit, and the failure to pursue a futile objection does not amount to ineffective assistance," these claims of ineffective assistance of counsel fail. *Dixon v. State*, 309 Ga. 28, 37 (843 SE2d 806) (2020) (citation and punctuation omitted). See also *Knighton*, 310 Ga. at 597 ("Because we concluded in Division 2 (b) above that the [trial] court did not err in that respect, counsel did not perform deficiently by failing to make such an objection.").

(b) Burdine claims that his trial counsel was ineffective because counsel failed to object or move for a mistrial with respect to certain allegedly improper comments by the State. The allegedly improper comments fit into two categories. First, Burdine contends that certain comments made during the prosecutor's opening statement "lumped" all three co-defendants together, but that the

41

comments were false as they pertained to Burdine. This claim, however, is based on a faulty factual premise because a careful review of the prosecutor's opening statement shows that, in context, the comments Burdine points to referenced only Collins and Love. Burdine has thus failed to show any error on which an objection could be based, so his counsel did not perform deficiently by failing to object. See *Knighton*, 310 Ga. at 597; *Dixon*, 309 Ga. at 37.

Second, Burdine contends that certain comments that the prosecutor made during his opening statement and during his direct examination of a detective were "inappropriate due to their legal nature" and that they violated *Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968). Specifically, Burdine points to the prosecutor explaining to the jury during opening statements that he would be allowed to ask Detective Chris Twiggs only about what each defendant said about himself, implying that he would not be able to ask Detective Twiggs about what each co-defendant said

42

about the other co-defendants.[17]  During direct examination of the detective, the trial court gave the jury limiting instructions based on *Bruton*, and — consistent with his opening statements — the prosecutor told the detective that he would be asking only about what each defendant said about himself and not about any other person.

We first address Burdine's argument that these comments were of an "inappropriate legal nature."  Burdine claims that "the prosecutor introduce[d] legal principles to the jury" about *Bruton* that were "addressed by the [trial] court and the State, but were inappropriate to mention to the jury."  The record, however, belies Burdine's claim.  To that end, the record shows that the prosecutor's comments during his opening statement and during his direct

---

[17] The prosecutor stated that "I'm only allowed to ask the detective about what a defendant says about himself" and that "I'm going to ask . . . what did Mr. Burdine say, if anything, about his role?  And he can talk about what Burdine told him about himself, and similarly for Love and similarly for Collins.  That's the way legally it has to work.  They talk about what happened to themselves."  The prosecutor also said that "I have already explained to you sort of the limitations about what we can ask the detective in terms of the defendants' statements . . . .  We can only ask what did . . . Burdine say against himself, and similarly for the other defendants."

43

examination of the detective accurately paraphrased the *Bruton-related* limiting instructions the trial court gave the jury before Detective Twiggs's testimony and again before jury deliberations. It also shows that the prosecutor did not suggest that the trial court had made any determination about the reliability or credibility of the evidence or whether the co-defendants had committed the acts in question. Because we cannot say that the prosecutor's comments were of an "inappropriate legal nature" such that an objection on that basis would have been meritorious under our case law, we also cannot say that defense counsel performed deficiently in failing to object. See, e.g., *Moore v. State*, 307 Ga. 290, 298, 299 (835 SE2d 610) (2019) (where the prosecutor's reference during opening statement to the trial court's evidentiary ruling "was accurate and noted the limited purpose for which the evidence would be used," "simply restated the evidentiary ruling by the trial court," and "contained no suggestion that the trial court had made any determination about the reliability or credibility of the evidence or whether [the defendant] had actually committed the acts in

44

question," it could not be said "that the prosecutor's remark was so improper under our case law that defense counsel performed deficiently in failing to object") (citation and punctuation omitted).

With respect to Burdine's *Bruton* claim, he contends that the prosecutor's comments during his opening statement and his direct examination of Detective Twiggs violated *Bruton* by creating a false impression that each of the co-defendants had given statements implicating the other co-defendants. Under *Bruton*, a defendant's Sixth Amendment right of confrontation is violated when co-defendants are jointly tried and "the testimonial statement of a co-defendant who does not testify at trial is used to implicate another co-defendant in the crime. However, *Bruton* excludes only the statement of a non-testifying co-defendant that standing alone directly inculpates the defendant." *Morris v. State*, 311 Ga. 247, 255 (857 SE2d 454) (2021) (citation and punctuation omitted).

Even assuming (without deciding) that Burdine can challenge under *Bruton* comments the prosecutor made during opening

statements, any such challenge fails.[18] The record shows that the prosecutor did not say during his opening statement that Collins or Love had said anything about Burdine or a person whom the jury could infer to be Burdine, much less that Collins or Love directly inculpated Burdine. The record shows the same with respect to the prosecutor's direct examination of Detective Twiggs. Accordingly, we cannot say that the prosecutor's comments about what the detective was allowed to say regarding the co-defendants' statements constituted the type of clearly inculpatory information about Burdine that could amount to a *Bruton* violation. See *Simpkins v. State*, 303 Ga. 752, 756-757 (814 SE2d 289) (2018) (assuming that a *Bruton* challenge can be made to the State's opening statement, the prosecutor's explicit comment in opening statement about what one co-defendant had done, but not what the other co-defendant had done, did not amount to a clear *Bruton*

---

[18] See, e.g., *Zackery v. State*, 286 Ga. 399, 402 (688 SE2d 354) (2010) ("[W]hat is said by the attorneys in opening statements is not evidence, and the jury was so instructed in this case. . . . Thus, the appropriateness of a *Bruton* challenge in the situation of comments made in the course of the State's opening statement is subject to question.").

violation such that the failure of the other co-defendant's trial counsel to object was deficient); *Zackery v. State*, 286 Ga. 399, 402 (688 SE2d 354) (2010) (assuming that a *Bruton* challenge can be made to the State's opening statement, there was no *Bruton* violation where the prosecutor's comment in opening statement that one co-defendant felt that another co-defendant was involved in the crime fell short of clearly inculpating that other co-defendant); *Watkins v. State*, 285 Ga. 107, 110-111 (674 SE2d 275) (2009) (no *Bruton* violation where the prosecutor's direct examination of the lead detective showed that one co-defendant said something about another co-defendant but no inculpatory information about that other co-defendant was revealed to the jury).[19]  Any objection on *Bruton* grounds therefore "would have been futile," and Burdine's

[19] Burdine primarily relies on *Ardis v. State*, 290 Ga. 58, 60 (718 SE2d 526) (2011), to support his argument that the prosecutor created a false impression that each co-defendant had implicated the others.  But here, unlike in *Ardis*, no redaction of a written statement was involved, and the prosecutor did not say or imply that any co-defendant had said anything about either of the other co-defendants.  Cf. id. at 60 (although a non-testifying co-defendant's statement that is redacted to eliminate any reference to the defendant may not violate *Bruton*, "statements which[,] despite redaction, refer directly to a person whom the jury may infer to be the defendant run afoul of the confrontation clause") (citation and punctuation omitted).

claim of ineffective assistance accordingly fails.  See *Morris*, 311 Ga. at 255 (citation and punctuation omitted).

(c) Burdine also claims that his trial counsel was ineffective in failing to object to, or request to have stricken, Black's testimony about overhearing while she was visiting Christiansen's apartment on the day of Kelley's murder the three co-defendants planning to rob someone without specifying which co-defendant made which comment — which Burdine characterizes as "inadmissible hearsay intentionally solicited by the State."  Burdine does not explain, however, how that testimony constituted hearsay, instead making only the cursory argument that the testimony was "known to be unreliable, if not totally untrue," and that "the prosecutor intentionally solicited [the] testimony."  Indeed, Burdine neither cites Georgia's Evidence Code nor offers legal analysis to support his contention on appeal.  We therefore deem this enumeration of error abandoned under Supreme Court Rule 22.  See, e.g., *Lester v. State*, 310 Ga. 81, 87 (849 SE2d 425) (2020) (in the absence of legal authority or legal analysis, an appellant's argument is deemed

abandoned under Rule 22); *Clay v. State*, 309 Ga. 593, 597 n.9 (847 SE2d 530) (2020) (blanket claim that a "statement was inadmissible because it was obtained after an alleged illegal arrest" was deemed abandoned because appellant offered "no argument or evidence as to why his arrest was illegal").

(d) Collins claims that his trial counsel was ineffective because counsel failed to seek redaction of a portion of Collins's indictment. Specifically, he contends that trial counsel should have sought to redact his prior first-offender felony of violating the Street Gang Terrorism and Prevention Act, OCGA § 16-15-1 et seq., from the indictment's felony murder count predicated on possession of a firearm by a first-offender probationer. Collins also complains that his counsel should have, but did not, stipulate to Collins's status as a first-offender probationer and seek to exclude evidence of his prior violation of the Street Gang Act. It is the admission of that evidence that Collins contends caused him prejudice.

However, even assuming that counsel performed deficiently by not taking action to keep evidence of Collins's prior Street Gang Act

49

violation from the jury, Collins has not shown how this deficiency likely affected the jury's verdicts. Collins was indicted for felony murder predicated on possession of a firearm by a first-offender probationer in that he caused Kelley's death while "having been placed on probation as a felony first offender on or about April 16, 2012, . . . of the offense of Violation of the Georgia Street Gang Terrorism and Prevention Act, . . . [and] did possess and transport a firearm . . . ." Collins's first-offender adjudication for violating the Street Gang Act was admitted without objection, and that adjudication revealed that Collins was associated with the Bloods criminal street gang, committed the misdemeanor offense of reckless conduct by endangering the safety of others when he discharged a 9-millimeter handgun in the back yard of a residential property, and also committed the misdemeanor offense of discharge of a gun near a highway or street. See OCGA §§ 16-5-60 (b) (reckless conduct), 16-11-103 (discharge of a firearm on or near a public highway).

When the adjudication was admitted into evidence at trial, the prosecutor described it only as "a certified first offender plea for . . .

Collins to felony violation of" the Street Gang Act. The trial court promptly gave a limiting instruction for Collins's first-offender adjudication and also for Burdine's prior conviction (which was admitted at the same time), explaining that the jury could "consider this evidence only insofar as it may relate . . . to being a required element of conviction of a felony for offenses five and six and for no other purpose or reason."[20] During closing argument, the prosecutor again explained that Collins was "on first offender probation" pursuant to a plea to violation of the Street Gang Act and also argued that because of that status, Collins was not allowed to possess or transport a firearm. The trial court again gave a limiting instruction after closing arguments were completed.

_____

[20] Collins argues that the prejudice he suffered from admission of his first-offender adjudication was exacerbated when the trial court and his attorney referred to it as a "conviction." But even to the extent Collins suffered prejudice from the admission of that adjudication, he suffered little, if any, additional prejudice because of incidental references to a prior "conviction," given that the adjudication that was admitted clearly showed Collins's treatment as a first offender, the prosecutor consistently referred to the adjudication as a first-offender "plea," and it was not unreasonable to refer to Collins's "first-offender disposition colloquially as a 'conviction' given that he had entered a plea of guilty, and the disposition carried negative consequences for him and temporarily resolved the charges against him." *Chavez v. State*, 307 Ga. 804, 811 (837 SE2d 766) (2020).

Because the nature of Collins's prior violation of the Street Gang Act was "not emphasized" but was "properly used only to establish" the first-offender-probationer "element of" his felony-murder charge predicated on possession of a firearm by a first-offender probationer; because the underlying misdemeanors of reckless conduct and discharging a firearm near a highway were never mentioned except in the adjudication itself; and because the trial court twice gave a limiting instruction, which "[w]e ordinarily presume that jurors follow," we conclude that the evidence of Collins's prior first-offender adjudication — especially when contrasted with the strong evidence of his guilt in this case — "was only a minor consideration at the trial" and "had no probable effect on the outcome of [his] trial." *Bentley v. State*, 307 Ga. 1, 8-10 (834 SE2d 549) (2019) (concluding that the admission of a certified copy of the defendant's convictions for rape and incest likely did not affect the jury's guilty verdicts).

(e) Finally, Collins claims that his trial counsel was ineffective when counsel encouraged the trial court "not to answer a critical

question from the deliberating jury." Similarly, Burdine claims that his trial counsel was ineffective in failing to request the trial court to address specifically the legal issue raised by the same question.[21] Because neither Collins nor Burdine has shown that his respective counsel was deficient with regard to their approaches to the jury's question, this claim fails.

During deliberations, although the jury had been given a written copy of the trial court's instructions, the jury submitted the following written, two-part question it denominated a "Rule of Law Question": "(1) If two parties participated in the planning of Crime A, and Participant # 1 commits Crime B, are both participants guilty

---

[21] Burdine also raises this issue apart from his claim of ineffectiveness, separately asserting that the trial court erred by failing to address specifically the legal issue raised by the jury's question. As recounted below, however, Burdine's counsel told the trial court that it should not answer the question. Burdine therefore "affirmatively waived his right to challenge the trial court's action." *Hughes v. State*, 310 Ga. 453, 457 (851 SE2d 580) (2020) (appellant affirmatively waived any error in answering the jury's questions on the issue of proximate cause when he "agreed that re-reading the indictment was the appropriate means to answer the jury's questions"). See also *Hicks v. State*, 295 Ga. 268, 275 (759 SE2d 509) (2014) ("[B]ecause appellant expressly told the trial court that it should not answer the [jury's] question, appellant invited the alleged error, and it therefore provides no basis for reversal.") (citation and punctuation omitted).

of Crime B?  (2) Does the level of Crime A (Felony or Misdemeanor) affect the answer to Question 1?"  The record shows that counsel for the three co-defendants and the prosecutor agreed that the question should not be answered.  Specifically, Burdine's counsel said with respect to the jury's question:

> I don't think your Honor should answer those questions. I think you have given them all the law that they need. . . .  [Y]our honor has given them the jury charges. I don't think you should refer to any specific jury charge, you just need to tell them that they have been given all the law they need and the answers to their questions are contained in the jury charges, which in a sense, they are.

Collins's counsel agreed and added that "if you do recharge them, depending on, I'm assuming either conspiracy or party to a crime or whatever, . . . then I will ask that they also be recharged for mere association, mere presence and knowledge and stuff like that." After the prosecutor suggested telling the jury that "if you find that two or more parties participated in a crime, the law of party to the crime and conspiracy culpability would apply, as I have previously charged you," Collins's counsel "object[ed] because it is directing them to the parties to the crime and conspiracy culpability" and "[s]pecifically

54

saying party to the crime and conspiracy culpability directs them towards that." Burdine's counsel then said that if the trial court were to accept the State's suggestion, "you are basically doing part of the decision making and helping them and steering them to a verdict." Burdine's counsel mentioned the option of reading the entire jury charge again, but was reluctant to have the court spend the 45 minutes that rereading the whole charge would take, and the trial court rejected that option. Finally, Burdine's counsel said that "[i]f we are going to do what [the State] suggests, then I ask you to do what [Collins's counsel] suggested." The trial court ultimately responded to the jury with the following:

> Let me give you the answer the law allows me to give you. I have read you the charge and I have given you the charge. To the extent there is an answer, it is in the charge. I cannot say, "look here" or "look there," because then I'm favoring one part of the body of this charge over another. And I didn't want to read the whole thing out for another 45 minutes, but you have the complete charge. If there is an answer to your question, it is in the charge. Now, the second part is almost a factual question. Any fact to be determined in this case will be determined by you, based on what you heard from the stand, from the exhibits, or from the stipulations. I cannot answer anything that has to do with the facts. That is solely and

55

completely in your province. So I cannot answer this in any way that answers a factual question, and I am required to tell you that the answer, if there is an answer, is in this charge that I have sent you. So that doesn't necessarily help you, but it's what the law requires that I do.

After excusing the jury, the trial court asked the prosecutor and each of the co-defendants' attorneys if they had any objection, and each one answered no.

In sum, the trial transcript shows that both Burdine's and Collins's counsel were concerned that either a specific answer to the jury's question or rereading only a portion of the charge including conspiracy and parties to a crime could upset the balance of the entire charge, amount to an improper comment on the evidence, or run the risk of focusing the jury's attention on the State's theory of their clients' guilt. "[W]e cannot say that the worries of counsel were unreasonable ones, and we likewise cannot say that the strategy employed by counsel — to agree to the trial court simply referring the jury to the whole of the charges previously given — was unreasonable." *Davis v. State*, 296 Ga. 126, 131 (765 SE2d 336)

(2014) (holding that the defendant failed to show ineffective assistance based on counsel agreeing, "[i]n response to the jury question about parties to a crime," for "the trial court [to] simply instruct[ ] the jury to consider as a whole all of the charges previously given," because counsel explained that giving a "concise, direct, and accurate answer" to the jury's question "would amount to an improper comment on the evidence," "would not be helpful to" the defendant, "would only emphasize the several ways in which [the defendant] could be held responsible for the crimes with which he was charged," and would require, in order to "avoid[ ] such undue emphasis," a recharge on "several additional matters as well, including mere presence and association," and because counsel explained that "the trial court had given the jury a written copy of the complete charge" and so "recharging the jury on parties to a crime and related matters would only involve another reading of instructions that the jury already had, and counsel saw little to be gained by such a recharge"). As a result, we conclude that neither Collins's nor Burdine's counsel was constitutionally deficient in this

regard, and Collins's and Burdine's claims of ineffective assistance of counsel therefore fail.

*Judgments affirmed.  All the Justices concur.*

Decided October 5, 2021 — Reconsideration denied November 2, 2021.

Murder. Cobb Superior Court. Before Judge Schuster.

*The Steel Law Firm, Brian Steel*, for appellant (case no. S21A0627).

*T. Bryan Lumpkin*, for appellant (case no. S21A0628).

*Kilgore & Rodriguez, H. Maddox Kilgore*, for appellant (case no. S21A0629).

*Flynn D. Broady, Jr., District Attorney, John R. Edwards, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, William C. Enfinger, Assistant Attorney General*, for appellee.