312 Ga. 696
FINAL COPY

S21A1014.  JONES v. THE STATE.

McMillian, Justice.

Steven Jamal Jones appeals his convictions for malice murder, aggravated assault, and other offenses arising in connection with the death of Quincey Denton and the assault of Kenneth Studivant.[1] Jones argues on appeal that the evidence was insufficient to support

---

[1] The crimes occurred on June 16, 2012, and on August 6, 2013, a Ware County grand jury indicted Jones on one count of malice murder (Count 1), one count of felony murder (Count 2), two counts of aggravated assault (Count 3 for the aggravated assault of Denton and Count 4 for the aggravated assault of Studivant), and two counts of possession of a firearm during the commission of a crime, based on the aggravated assaults (Counts 5 and 6). Jones was tried from November 13 to 15, 2013, and the jury convicted him on all counts. The trial judge sentenced Jones to life imprisonment for malice murder; twenty years in prison, to run consecutively to Count 1, for the aggravated assault of Studivant; and a five-year term of imprisonment on each of the possession counts, with the sentence on Count 5 to run consecutively to Count 4 and the sentence on Count 6 to run consecutively to Count 5. The other aggravated assault count was merged into Count 1, and the felony murder count was vacated by operation of law.

Jones filed a timely motion for new trial on December 11, 2013, which was amended by new counsel on October 7, 2019. After a hearing, during which the parties agreed to submit the motion for new trial to the trial court on briefing, the trial court denied the motion on September 3, 2020. Jones filed a timely appeal to this Court, and the case was docketed to the August 2021 term of this Court and submitted for a decision on the briefs.

his convictions and that the trial court erred in denying his motion for mistrial after the admission of allegedly improper character evidence during the State's case. As these contentions have no merit, we affirm.

In June 2012, Denton was living in one side of a duplex in Waycross with his girlfriend, Angela Williams, and her seven-year-old son, M. F. Studivant lived on the other side of the duplex.

At around 9:15 p.m. on June 16, Rhoda and Willie White were driving home from the grocery store when they saw Jones, whom they knew, and a man they did not know walking near their home, which was around the corner from Denton's duplex. Jones and the other man were dressed in dark or black clothing. Willie testified that Rhoda spoke to Jones and Jones responded. Jones did not live in the neighborhood, and Willie had never seen him there before. The same night, Williams's mother, Katrina Lane, and her husband, Bernard Davis, who lived across the street from the duplex, were attending a birthday party for M. F. at Denton's house when they saw two men dressed in black, one short and the other tall, walking

back and forth near the house. Lane had never seen the two men before. One witness testified that Jones was approximately 6 feet to 6 feet, 1 inch tall.

Williams left the duplex at around 10:30 that night, leaving Denton, M. F., and a friend at the house. The friend later left, and, at some point, Studivant walked outside onto the porch of the duplex to smoke a cigarette. As Studivant was sitting outside, two armed men approached, grabbed him, and forced him into Denton's side of the duplex through the front door. When the men entered the duplex, M. F. was lying on the sofa in the front room watching television. M. F. testified that the intruders were armed and wearing sunglasses with scarves over their mouths. One was short, and the other was tall. After the men walked past M. F., he fled out the front door and ran to Lane's house across the street.

Meanwhile, the two men forced Studivant into a bedroom where Denton was watching television. They made Denton and Studivant kneel on the floor and lie face-down across the bed with their hands on the bed. Studivant heard one of the men direct the

other to "hit him, hit him, hit him," and then heard a commotion, but Studivant testified that he was scared and "didn't dare move."

Lane called 911 after M. F. told her what had happened, and M. F. testified that while he was at Lane's house, he heard a gunshot. Both Lane and Davis stepped outside to see what was happening. From her porch, Lane saw a person, whom she described as short, run out the side door of the duplex toward some nearby bushes. She then saw a taller person "busting out" the front door, breaking it, and heading toward the same area. Davis heard someone beating on the front door and also saw someone wearing dark clothing break through the front door and run away.

After the noise died down, Studivant got up and saw Denton lying on the bed with blood around him. Studivant left the duplex through the front door and told Davis, who was outside on his front porch, that Denton had been shot. Lane then asked the 911 operator to send an ambulance.

Willie White, who was home cooking at the time, heard gunshots and the sounds of someone running. He looked out his door

and, from the light on Denton's porch, saw two people running — one of whom he recognized as Jones, who was still wearing dark clothes. The two men were running from Denton's house toward a nearby trail through a wooded area. Although Willie failed to pick Jones out of a police lineup as the man he saw that night, Willie testified at trial that when police officers showed him the lineup with Jones's picture, he chose not to identify Jones because he does not "judge people," and he did not "want to be the one to pass judgment."

When law enforcement officers responded to the scene of the shooting, they discovered Denton on his knees lying face-down across the bed. He was unresponsive, with no pulse, and had two small wounds to his head and a gunshot wound to his chest. The coroner later pronounced him dead at the scene. The area around Denton's house was searched, leading to the discovery of a black Rossi .38-caliber revolver, which appeared to have been recently tossed in some tall grass in a field near the wooded area where witnesses said the intruders ran. One shot had been fired from the

revolver, and the weapon's four remaining chambers contained live rounds.

At trial, the medical examiner testified that the gunshot wound was the cause of Denton's death and that the wounds to his head were consistent with Denton having been "pistol whipped." The medical examiner was able to retrieve the fatal bullet from Denton's body. Later testing by the GBI determined that the bullet recovered from Denton's body had been fired from the .38-caliber revolver recovered near Denton's house, and DNA samples taken from the grip of the gun were a match for Jones's DNA.

Later on the night of the shooting, Steven Clerge learned that Denton had been shot, and he and a friend drove to the scene of the shooting. They did not stay long, and after they left, they encountered Jones walking down the road right around the corner from the murder scene. Jones, who was wearing a black shirt and dark pants, got in their car. Clerge described Jones as "acting off" that night — "like he had a lot on his mind." When Jones got in the car, he was fidgeting and talking to himself in the back seat. The

three men later returned to the crime scene, but Jones got "antsy" when someone said something about a warrant, and he offered Clerge $10 to drive him to Jones's girlfriend's house. When they got back in the car, Jones did not say where his girlfriend lived, but instead kept directing Clerge where to turn, and they ended up circling the crime scene twice before Jones eventually asked Clerge to drop him somewhere else. They never made it to the girlfriend's house.

Jones was ultimately arrested for Denton's murder based on witness statements that they had seen him in the area around the time of the shooting and later fleeing from the scene and the match between his DNA and the samples taken from the grip of the murder weapon.

At trial, the defense presented testimony from Jerome Martin, who said he was with Jones for "a couple of minutes" on the night of the murder. Martin testified that a .38-caliber weapon shown to him by a police detective looked like a gun that a man tried to sell to Jones and him that night. Both Martin and Jones handled the

7

weapon, and Jones held it by its grip. But, Martin testified that they decided not to buy the gun. However, the State presented evidence that the DNA recovered from the murder weapon contained only one DNA profile, which was compared with DNA samples provided by Martin and Jones, and it matched only Jones's DNA sample.

1. Jones argues that even giving all proper deference to the jury's resolution of conflicts in the testimony, no rational factfinder could conclude that he committed the crimes in this case.

In reviewing Jones's challenge to the sufficiency of the evidence to support his convictions as a matter of constitutional due process, we view the evidence in the light most favorable to the verdict and consider whether any rational trier of fact could have found him guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "Our limited review under the standard set out in *Jackson* leaves to the jury the resolution of conflicts in the testimony, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Menzies v. State*, 304 Ga. 156, 160

(II) (816 SE2d 638) (2018) (citation and punctuation omitted).

Jones was seen in the vicinity before the crimes occurred, and a witness spotted him fleeing from the crime scene and running toward a wooded area near Denton's house immediately after the witness heard gunshots. The revolver that fired the fatal gunshot was located in a field near that wooded area, and Jones's DNA was found on the grip of the gun. His height and clothing matched the descriptions provided by witnesses. We conclude that this and other evidence presented at trial, although circumstantial, was strong and more than sufficient to support Jones's convictions in this case. See *Carson v. State*, 308 Ga. 761, 764 (1) (843 SE2d 421) (2020) (DNA and other evidence placing defendant in vicinity of crime before and after murder, though circumstantial, was sufficient to support convictions); *Carter v. State*, 289 Ga. 51, 52 (1) (709 SE2d 223) (2011) (circumstantial evidence showing that defendant matched eyewitness's description of one of the two gunmen and defendant's fingerprints were found on the outside of the car used in the crimes was sufficient to support his convictions).

2. Jones also contends that the trial court erred in not granting a mistrial when he says his character was improperly put before the jury during the direct examination of a witness for the State.

During the State's examination of Jones's girlfriend, who appeared at trial as a prosecution witness, she testified that she and Jones had gotten a room at a local motel the day after the shooting. After Jones's girlfriend denied that she and Jones had discussed Denton's murder, the prosecutor asked her what they talked about while at the motel. She replied that they talked about "what [they] always talked about." Then, in response to the prosecutor's question asking what that was, she said that she and Jones were just spending time together "because we knew he had to turn himself in for probation."

At that point, Jones's counsel moved for a mistrial, arguing that the damage from Jones's girlfriend's testimony could not be cured. Further colloquy outside the presence of the jury revealed that Jones was on probation at the time for misdemeanor disorderly conduct, and Jones's counsel was permitted to question Jones's

girlfriend about her knowledge of the circumstances of that probation.

The trial court denied the mistrial, finding that the prosecution's question "was not leading to intentionally elicit that response; that it was just . . . a spontaneous response by the witness, perhaps inadvertent." But the trial court acknowledged that the testimony raised an issue as to Jones's character and offered to give a curative instruction to the jury. Defense counsel replied that he "would either ask for a curative instruction or else inform the jury about the nature of the probation." After weighing these options, trial counsel first asked for a curative instruction but later changed his mind and said he did not want an instruction and instead would cross-examine the witness about the circumstances surrounding Jones's probation. After the jury returned, defense counsel elicited testimony that Jones was on probation for six months for disorderly conduct, that a warrant was issued because he failed to complete his GED, a condition of the probation, and that Jones turned himself in to the police.

11

On appeal, Jones again asserts that there was no way to cure the harm arising from his girlfriend's testimony, and because the evidence against him was not substantial or overwhelming, he is entitled to a new trial. But we need not decide if the trial court abused its discretion in denying the motion for mistrial because Jones waived his right to raise the issue on appeal when his trial counsel affirmatively declined the trial court's offer to give a curative instruction. See *Stephens v. State*, 307 Ga. 731, 740 (5) (b) (838 SE2d 275) (2020) (defendant cannot complain on appeal about the denial of his motion for mistrial "because his counsel affirmatively informed the court that [the defense] did not want a curative instruction to be given" and thus waived the issue for appellate review); *Brewer v. State*, 301 Ga. 819, 820 (2) (804 SE2d 410) (2017) ("Given that [the defendant] declined the court's offer to give a curative instruction with regard to the statement, . . . [he] has waived his right to complain about the trial court's [refusal to grant his motion for mistrial]." (citation omitted)). Because Jones waived the issue for appellate review, this enumeration of error presents

nothing for us to consider.

*Judgment affirmed. All the Justices concur.*

Decided October 19, 2021.

Murder. Ware Superior Court. Before Judge Gillis.

*T. Craig Head, Jr.*, for appellant.

*George E. Barnhill, District Attorney, Joshua T. Brockington, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.