313 Ga. 120
FINAL COPY

S21A0942.  TERRELL v. THE STATE.

McMILLIAN, Justice.

In 2005, a jury found Frederick Terrell guilty of felony murder, aggravated assault, and other crimes related to the shooting death of Tashiba Matthews.[1] On appeal, Terrell asserts that he is entitled

---

[1] The crimes occurred on September 5, 2004. In December 2004, a Fulton County grand jury indicted Terrell, along with Kelvin Gilliam, Dwight Parks, and Michael Stinchcomb, for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault with a deadly weapon (Count 3), aggravated assault against Tamara Ross, D. R., G. R., Anthony Taylor, Michael Mitchell, Keretesha Hines, Unita Hines, Lisa Johnson, A. H., Charlene Thompson,  Charlie Nixon, and Orlando Wimbley (Counts 4-15), and possession of a firearm during the commission of a felony (Count 17). Terrell was separately indicted on one count of possession of a firearm by a convicted felon (Count 18), and Stinchcomb was separately charged with an additional count of aggravated assault against Janet Lymon (Count 16). Prior to trial, Parks pleaded guilty to Count 3. A joint trial of Terrell, Gilliam, and Stinchcomb was held from April 4 to 14, 2005. The trial court entered a directed verdict of acquittal on Counts 12, 13, 14, and 15. The jury found Terrell guilty of Counts 2, 3, 5, 6, 8-11, and 17, but not guilty of Counts 1, 4, 7, and 18. The jury also found Gilliam guilty of Counts 5, 6, and 8-11 and Stinchcomb guilty of Counts 5, 6, 8-11, and one count of simple battery as a lesser included offense of Count 13; their convictions are not at issue in this appeal. On April 29, 2005, the trial court sentenced Terrell to serve life in prison for Count 2 and five years in prison for each of Counts 3, 5, 6, and 8-11 (to run consecutively to Count 2 and concurrently with each other) and five years in prison for Count 17, to run consecutively to Count 2. Terrell timely filed a motion for new trial on May 2, 2005. On March 24, 2017, the trial court

to a new trial based on the inordinate delay of his appeal, the State's improper comment on his right to remain silent, the denial of his motion to sever, the denial of his motion for mistrial, constitutionally ineffective assistance of counsel, and the prejudicial effect of the combined errors of the trial court and counsel. For the reasons that follow, we affirm, except that we vacate in part to correct a sentencing error.

The evidence presented at trial showed that in September 2004, Terrell lived in an apartment located on James P. Brawley Street in Atlanta ("the apartment"), along with Lesia Gilliam, whom he considered to be his aunt, and co-defendant Michael Stinchcomb. Lesia is co-defendant Kelvin Gilliam's mother. On September 5,

---

entered an order appointing new appellate counsel, noting that the Georgia Public Defender Council "disclaims responsibility for providing [a]ppellate counsel for cases indicted prior to January 1, 2005, and it appear[s] that the Atlanta Judicial Circuit Public Defender's Office is prohibited from representing [Terrell] . . . due to its representation of one of the co-Defendants." On November 2, 2018, the State filed a motion for status conference pursuant to Uniform Superior Court Rule 42.1. In April 2019, Terrell filed an amended motion for new trial. Following a hearing in August 2019, the trial court denied the motion on November 12, 2019, and Terrell timely appealed. The case was docketed in this Court to the August 2021 term and submitted for a decision on the briefs.

Stinchcomb got into a dispute with Janet Lymon over a portion of drugs they were supposed to be splitting and punched her in the eye while they were arguing outside the apartment. A. H., a 13-year-old boy who knew Janet from the neighborhood, saw Stinchcomb strike her. A. H. lived in a nearby house on James P. Brawley Street ("the house"), just down the street from the apartment, with his grandmother, sisters Matthews and Keretesha Hines, their mother Unita Hines, and Keretesha's boyfriend Anthony Taylor. When he arrived home, A. H. told his family what he had seen, and the news reached Janet's daughter, Karen Lymon.

Karen joined her boyfriend, Paul Smith, and multiple friends at the house, and the group walked down the street to the apartment to question Stinchcomb about hitting Janet. When they arrived, Karen saw her mother's injuries and confronted Stinchcomb outside the apartment. Stinchcomb retreated inside, and several people followed, pushing their way past Lesia at the apartment door. Karen, Smith, and at least one other friend began beating Stinchcomb.

Multiple witnesses testified that shortly after the incident with Stinchcomb, they saw a car stop in front of the house and four men, including Terrell, get out of the car. Terrell yelled, "I'm fittin to kill all y'all motherf***ers" and shot multiple times in the direction of the people sitting on the front porch.[2] Stinchcomb pointed out two women, who were running away, and said, "There go two of them right there." Before leaving, Terrell told Unita, "Tell that b***h, [Paula Mathis] and [Karen], [I'm] going to kill them when [I] see them. As a matter of fact, anybody off this porch come down this street, I'm going to kill them."

Matthews, who was inside the house at the time, walked down the street with her boyfriend, Broderick Stallings, to talk to Terrell when she learned that Terrell had shot at the house. Neither Matthews nor Stallings was armed, but Matthews was friends with Terrell and thought that she would be able to reason with him.

---

[2] Evidence showed that Tamara Ross, her children, D. R. and G. R., Michael Mitchell, Keretesha, Taylor, Unita, and Paula Mathis (also known as "Lisa Johnson," which was the name used in the indictment) were outside when Terrell fired multiple shots toward the front porch.

However, as Matthews and Stallings approached the apartment, Terrell fired multiple rounds at them, fatally striking Matthews. Terrell, Stinchcomb, Gilliam, and Parks then fled the scene in Gilliam's car.

Officer Thomas Burns of the Atlanta Police Department responded to a call of shots fired from a brown Crown Victoria occupied by four men in the area of James P. Brawley Street and Neal Street. As he was approaching the scene, Officer Burns noticed a vehicle with a tag number matching that provided to the 911 dispatcher and initiated a stop of the vehicle. Responding officers located four men in the vehicle; the front passenger, later identified as Terrell, had a rifle on his lap and an extra magazine containing 9mm ammunition in his front left pocket.

When police officers arrived at the house, there were a lot of people milling around outside. Officers discovered two 9mm shell casings on the ground and several bullet holes in the house. Officers located Matthews's body on the street outside the apartment and retrieved four 9mm shell casings nearby. Two witnesses at the scene

5

said that they saw "Boochie" shoot Matthews and later identified Terrell's photo in a photographic lineup as Boochie. The medical examiner testified that Matthews died from a single gunshot wound to the head. A GBI firearms examiner testified that the firearm recovered from Terrell had fired the bullet that killed Matthews, as well as each of the casings recovered from the crime scenes.

Co-indictee Dwight Parks testified that soon after the confrontation between Stinchcomb and Janet, Terrell called to tell him what had happened and said that he was coming to Parks's house and that Gilliam would pick them up so they could go check on Lesia. According to Parks, when Terrell got to his house, Terrell was upset and said he was going to shoot Stallings, Matthews's boyfriend. Parks did not know why Terrell thought Stallings was involved in the incident. Gilliam arrived in a brown four-door Crown Victoria, and Parks noticed a rifle leaning against the front passenger seat where Terrell sat. When the three men arrived at the apartment, Terrell and Gilliam went inside for a few minutes and returned with Stinchcomb, whose mouth was "busted up." Gilliam

drove them down the street to the house, and Stinchcomb began pointing out people, saying, "There they go. There they go." Terrell then started shooting in the direction of the porch. Everyone got back in the car, and they returned to the apartment. Parks was walking away from the car when he heard gunfire again and ran behind a wall. When he realized it was Terrell shooting, he thought, "[T]hat guy done went crazy." Lesia started yelling at them "to get the hell out of here," and the four men got back into the car and drove away.

Terrell testified on his own behalf at trial and admitted that he went to the house that evening "to get answers" after a group had broken into and "trashed" his apartment. However, Terrell claimed that Stallings was standing in the doorway with a gun and that Stallings first raised the gun and shot toward him.[3] Terrell responded with two or three shots before the four men returned to the apartment in Gilliam's car. While Terrell remained outside the

---

[3] Stallings also testified at trial and denied having a weapon on him that day.

apartment talking to Lesia, he saw Stallings and Matthews walking toward the apartment. Terrell claimed that Stallings raised a handgun at him, so he picked up his rifle and fired at Stallings two or three times in self-defense. Terrell also testified that he had spoken with Stallings a few days before the shooting and learned that Stallings had recently been released from prison after serving ten years for what Terrell believed to be murder. Terrell claimed that he had brought a gun with him to the house because he "knew what kind of people [he] was up against."

1. Terrell first asserts that he is entitled to a new trial based on the inordinate delay of his appeal. Specifically, Terrell contends that, because of the delay in his appeal, a change in the law in 2018 regarding the presumption of harm from a defendant's use of peremptory strikes on a juror who should have been excused for cause made his appeal on this basis less likely to be successful. We disagree.

We begin our analysis by setting out the four factors relevant to a due process claim premised on appellate delay: (1) the length of

the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. See *Dawson v. State*, 308 Ga. 613, 623 (4) (842 SE2d 875) (2020). In the context of appellate delay, "prejudice, unlike in the speedy trial context, is not presumed but must be shown." Id. (citation and punctuation omitted). This Court has "repeatedly found that the failure to make this showing of prejudice in an appellate delay claim [is] fatal to the claim, even when the other three factors weigh in the appellant's favor." Id. (citation and punctuation omitted). And finally, in this context, the necessary prejudice "is prejudice to the ability of the defendant to assert his arguments on appeal and, should it be established that the appeal was prejudiced, whether the delay prejudiced the defendant's defenses in the event of retrial or resentencing." *Chatman v. Mancill*, 280 Ga. 253, 260 (2) (e) (626 SE2d 102) (2006).

The record shows that Terrell was represented at trial by Lawrence Lewis; Lewis timely filed a motion for new trial and a motion to withdraw on May 2, 2005. The trial court entered an order

9

appointing the Public Defender's Office as appellate counsel on June 7, 2005, and an order permitting Lewis's withdrawal from representation on June 12, 2005. Although Terrell was purportedly represented by two different attorneys in the following years, his appeal did not progress. Terrell, however, contacted the clerk's office numerous times to ask about his appeal and filed a motion for the appointment of appellate counsel in February 2017. Terrell's current counsel was appointed in March 2017, and counsel later amended the motion for new trial in April 2019 to raise a claim regarding post-trial delay.

To show prejudice by the appellate delay, Terrell points to the voir dire of Juror No. 3, whom he claims should have been excused for cause. He asserts that Juror No. 3 stated that she might be influenced by her cousin's conviction for armed robbery and her ex-boyfriend's shooting that occurred when he was the victim of a carjacking. With respect to her cousin's conviction, Juror No. 3 explained, "Well, I felt like he had committed the crime. He was on drugs and he needed money and he committed the crime. So I felt

like the verdict was just." When asked whether she would only base her decision on this case, Juror No. 3 responded, "I would make every effort to separate. I think it would be kind of hard to stand here and say that I don't have a past, and part of me being here today is part of — I had to get here somehow." Then, when pressed again as to whether she would be able to separate her feelings and emotions and not let them interfere with this trial, she stated, "I probably could do that."

As to her ex-boyfriend's shooting, Juror No. 3 responded, "Again, I don't know if I could forget or just not bring part of who I've been up to now." She also explained, however, that she "would do [her] best to be fair." Terrell also notes that Juror No. 3 stated that the shooting at issue in this case occurred "in [her] backyard, pretty much," although she had never been to that particular area of southwest Atlanta. When asked again whether she could be fair and impartial, Juror No. 3 responded, "At this time, again, it's close to home. I really couldn't say, I really couldn't give you. I don't know if I could be a fair juror." The trial court denied Terrell's motion to

strike Juror No. 3 for cause, explaining that her responses did not show a bias but rather an "association" she had. However, Juror No. 3 was later excused by co-defendant Gilliam's exercise of a peremptory strike.

According to Terrell, he was prejudiced by the delay in his appeal because, in the interim, there was a change in the law that negatively affected his appeal with respect to Juror No. 3. Previously, Terrell argues, he would have been entitled to a presumption of harm once he showed that Juror No. 3 should have been struck for cause and instead a peremptory strike was used to remove her from the jury. See *Fortson v. State*, 277 Ga. 164, 166 (2) (587 SE2d 39) (2003) (holding, in the context of an ineffective assistance of counsel claim, that trial counsel's use of a peremptory strike on a juror already excused for cause due to neglect was per se harmful error and thus sufficient to establish actual prejudice). However, in October 2018, this Court overruled this holding from *Fortson*, concluding that "a defendant is not presumptively harmed by a trial court's erroneous failure to excuse a prospective juror for

cause simply because the defendant subsequently elected to remove that juror through the use of a peremptory strike." *Willis v. State*, 304 Ga. 686, 707 (11) (a) (820 SE2d 640) (2018). See also id. at 704 (11) (a) (noting the United States Supreme Court "has clearly held that peremptory challenges to prospective jurors are not of constitutional dimension but instead are one means to achieve the constitutionally required end of an impartial jury" and concluding there is no reason to arrive at a different conclusion under the Georgia Constitution (citation and punctuation omitted)). Instead, under such circumstances, "a defendant must show on appeal that one of the challenged jurors who served on his or her twelve-person jury was unqualified." Id. at 707 (11) (a). Terrell argues that this change in the law makes it harder for him to prevail on this claim on appeal.

Turning to Terrell's claim that his due process rights were violated by the inordinate delay in his appeal, the State concedes that at least two of the four factors weigh in Terrell's favor — the

length of delay and the assertion of the right.[4] However, the State

argues that Terrell cannot show the required prejudice. In assessing

prejudice in this case, we begin by noting that "[w]hether to strike a

juror for cause lies within the sound discretion of the trial judge, and

the trial court's exercise of that discretion will not be set aside

absent a manifest abuse of discretion." *Collins v. State,* 308 Ga. 608,

612 (3) (842 SE2d 811) (2020) (citation and punctuation omitted).

And,

> [f]or a juror to be excused for cause, it must be shown that
> he or she holds an opinion of the guilt or innocence of the
> defendant that is so fixed and definite that the juror will
> be unable to set the opinion aside and decide the case
> based upon the evidence or the court's charge upon the
> evidence. A prospective juror's doubt as to his or her own
> impartiality does not demand as a matter of law that he
> or she be excused for cause. Nor is excusal required when
> a potential juror expresses reservations about his or her
> ability to put aside personal experiences.

*Brockman v. State,* 292 Ga. 707, 721 (9) (739 SE2d 332) (2013)

---

[4] The State asserts that there is insufficient evidence regarding the precise reasons for delay, but agrees it is the duty of all involved in the criminal justice system to ensure that appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay. See *Shank v. State,* 290 Ga. 844, 849 (5) (c) (725 SE2d 246) (2012).

14

(citation and punctuation omitted). Moreover, "the law presumes that potential jurors are impartial, and the burden of proving partiality is on the party seeking to have the juror disqualified." *Lopez v. State*, 310 Ga. 529, 535 (3) (f) (852 SE2d 547) (2020) (citation and punctuation omitted).

Here, Juror No. 3 stated that, despite her prior experiences, she would attempt to separate those issues from anything she heard in this case and would do her best to be fair. Based on the record before us, we conclude that the trial court did not abuse its discretion in determining that the juror had not expressed an opinion of guilt or innocence that was so fixed that she would be unable to decide the case based on the evidence presented at trial and the charge of the trial court. See *Collins*, 308 Ga. at 612-13 (3) ("A conclusion on an issue of bias is based on findings of demeanor and credibility which are peculiarly in the trial court's province, and those findings are to be given deference." (citation and punctuation omitted)). Because Terrell cannot show that he would have prevailed on the underlying claim that Juror No. 3 should have been excused for

cause, the change in the law on the presumption of harm in 2018 would have no effect on his appeal. Accordingly, Terrell is unable to show the requisite prejudice from the delay in his appeal, and this enumeration of error fails. See *Mattox v. State*, 308 Ga. 302, 305 (3) (840 SE2d 373) (2020) (denying speedy appeal claim from 2005 conviction because defendant failed to show prejudice); *Loadholt v. State*, 286 Ga. 402, 406 (4) (687 SE2d 824) (2010) (no prejudice in delay pending appeal where enumerations raised were without merit).

2. Terrell next asserts that his constitutional rights were violated when the State improperly commented on his right to remain silent.[5] Specifically, relying on this Court's holding in *Mallory v. State*, 261 Ga. 625 (409 SE2d 839) (1991), which announced the rule that the introduction of evidence of a defendant's pre-arrest silence or failure to come forward is always more

---

[5] Although this enumeration of error makes a passing reference to alleged federal and state constitutional violations, Terrell argues only that the State improperly commented on his pre-arrest silence in violation of *Mallory v. State*, 261 Ga. 625 (409 SE2d 839) (1991).

prejudicial than probative,[6] Terrell argues that a question asked by the State at trial improperly implicated his pre-arrest silence and that a new trial is required. We see no reversible error.

The record shows that during the State's direct examination of a detective, the prosecutor asked, "Now, Frederick Terrell, did he ever give a statement?" That question came right after the prosecutor elicited testimony from the detective that Stinchcomb, Parks, and Gilliam had made statements following their arrests. After the detective responded, "No," to whether Terrell had ever given a statement, the prosecutor immediately moved on to introduce the waiver of counsel forms related to Stinchcomb's and Gilliam's custodial statements. Terrell moved for a mistrial based on this exchange. The trial court denied Terrell's motion, and Terrell expressly declined the trial court's offer of a curative instruction.

---

[6] Terrell acknowledges that this rule was abrogated by our current Evidence Code, which took effect on January 1, 2013. See *State v. Orr*, 305 Ga. 729 (827 SE2d 892) (2019) (explaining that current Evidence Code precludes such judge-made exclusionary rules of evidence and instead requires trial courts to determine admissibility based on facts of the specific case and rules set forth in the Evidence Code). However, because Terrell's trial took place in 2005, the rule set out in *Mallory* applies to this case. See *Williams v. State*, 305 Ga. 776, 781 (2) (d) n.7 (827 SE2d 849) (2019).

17

Appellant points to nothing in the record indicating that the State was attempting to use the detective's response to imply that Terrell was guilty for failing to make a statement, nor have we found anything in the record to support that view. Instead, it appears that the State's question was part of a series of questions in which the prosecutor was establishing the narrative of the investigation in order to introduce statements made by the co-defendants. The State only asked this single question about Terrell's not giving a statement and did not otherwise argue or suggest at trial that Terrell's failure to give a statement supported a finding of guilt. Thus, even assuming that the *Mallory* rule regarding pre-arrest silence applies to the detective's testimony here, we conclude that this fleeting reference to Terrell's failure to make a statement likely did not contribute to the proceeding's outcome, and therefore any alleged violation of *Mallory* was harmless. See *Rowland v. State*, 306 Ga. 59, 66 (3) (829 SE2d 81) (2019) (alleged violation of *Mallory* was harmless given strong evidence of defendant's guilt and prosecutor's minimal use of the challenged evidence).

3. Terrell also argues that the trial court erred in not granting a mistrial on two separate grounds. "[W]hether to declare a mistrial is in the discretion of the trial court and will not be disturbed on appeal unless it is apparent that a mistrial is essential to the preservation of the right to a fair trial." *Stephens v. State*, 307 Ga. 731, 737 (3) (838 SE2d 275) (2020) (citation and punctuation omitted).

(a) Terrell first points to the prosecutor's alleged comment on his right to remain silent as a basis for the trial court to declare a mistrial. However, Terrell waived his right to raise this issue on appeal when he affirmatively declined the trial court's offer to give a curative instruction. See *Jones v. State*, ___ Ga. ___, ___ (2) (864 SE2d 456) (2021). Thus, this enumeration of error presents nothing for us to consider.

(b) Terrell also argues that the trial court should have granted a mistrial after one of the State's witnesses testified that Matthews was pregnant.

The record shows that, prior to trial, the trial court ruled that

19

the parties could not reference the fact that Matthews was pregnant at the time she was killed. However, while Gilliam's counsel cross-examined Matthews's mother the following exchange occurred:

> Q: You said that [Matthews] was initially asleep?
> A: She was [a]sleep when we first went down the hill. When we came back up the hill, she was in the bathtub.
> Q: Was she just waking for the day at that point or she had taken a nap that afternoon[?[7]]
> A: She had been up earlier and ate. She had just found out she was pregnant, so she was [a]sleep.

Gilliam's counsel immediately informed the court that he would like to make a motion outside the presence of the jury. The trial court denied the motion for mistrial at a sidebar, but indicated that counsel would be able to renew the motion after the jury was excused for the day.[8] During his own cross-examination, Terrell's counsel then asked Matthews's mother multiple questions about Matthews's pregnancy, eliciting testimony that Matthews had just

---

[7] Gilliam's counsel explained that, in pressing Matthews's mother regarding why Matthews had been asleep in the afternoon, he was attempting to show that Matthews was sleeping during the day because she was a drug dealer, and not to show that Matthews was pregnant.

[8] It is unclear from the record whether Terrell joined in this motion for mistrial.

taken a pregnancy test the night before and was not yet "showing."[9]

After the jury was excused for the day, Gilliam's counsel renewed his motion for mistrial based on the testimony about Matthews's pregnancy, arguing that the court had previously granted a motion to prevent the State from placing that fact into evidence. Terrell joined the renewed motion, which the trial court denied.

Pretermitting whether Terrell timely moved for a mistrial, we see no abuse of discretion by the trial court in denying the mistrial. The initial fleeting reference to Matthews's pregnancy was non-responsive to the question asked, and there is no indication that the State attempted to use Matthews's pregnancy to garner sympathy for the victim. Under these circumstances, we conclude that the trial court did not abuse its discretion in determining that a mistrial was not necessary to preserve Terrell's right to a fair trial and in refusing to grant the renewed mistrial motion on this basis. See *Simmons v. State*, 308 Ga. 327, 329 (2) (840 SE2d 365) (2020) ("Trial courts are

---

[9] Terrell's counsel testified at the motion for new trial hearing that he asked these questions to mitigate any harm from Matthews's mother's initial response.

21

vested with great discretion to grant or deny mistrials because they are in the best possible position to determine whether one is warranted." (citation and punctuation omitted)); *Boddie v. State*, 269 Ga. 5, 6 (2) (494 SE2d 651) (1998) (trial court did not abuse discretion in denying mistrial based on witness's fleeting reference to an event that incidentally put the defendant's character in issue, which the defendant explored on cross-examination).

4. Terrell argues that the trial court erred by denying his motions to sever his trial from that of his co-defendants because their trial strategies were antagonistic to his self-defense strategy. We conclude that the trial court did not abuse its discretion in denying a severance of Terrell's trial.

OCGA § 17-8-4 (a) provides that, "[w]hen two or more defendants are jointly indicted" for a felony where the State does not seek the death penalty, "such defendants may be tried jointly or separately at the discretion of the trial court." The relevant factors in ruling on a motion to sever are: "(1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one

22

defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses." *Smith v. State*, 308 Ga. 81, 85 (2) (839 SE2d 630) (2020) (citation and punctuation omitted). To show error in the denial of a motion to sever, the defendant bears the burden of establishing that "a joint trial was so prejudicial as to amount to a denial of his right to due process." *Marquez v. State*, 298 Ga. 448, 450 (2) (782 SE2d 648) (2016). Also, we have explained that the "mere presence of antagonistic defenses or possibility that a separate trial would give a defendant a better chance of acquittal is insufficient to show an abuse of discretion." *Smith*, 308 Ga. at 85 (2) (citation and punctuation omitted).

Prior to trial, Terrell filed a motion to sever, which he renewed just before opening statements at trial. The trial court denied both motions. On appeal, Terrell claims that his co-defendants' defenses were antagonistic to his assertion that he shot in self-defense because his co-defendants' strategy was to assert that Terrell "went crazy," so there was no reason for them to know ahead of time that the shooting might occur.

23

However, "antagonistic defenses are insufficient to require severance in a non-death penalty case absent a showing of prejudice." *Johnson v. State*, 301 Ga. 205, 208 (III) (800 SE2d 296) (2017). Although the co-defendants claimed that Terrell "went crazy" and that they had no notice that he would start shooting, the evidence was strong that Terrell went to the house with the intent of retaliating against those who had "trashed" the apartment. Parks testified that Terrell told the co-defendants that he was going to shoot Stallings before going to the house and that there was a rifle in the passenger seat of the car where Terrell was sitting on the way to the house. Upon approaching the house, Stinchcomb pointed out people while Terrell shot at them. Moreover, the failure to sever did not impede Terrell from presenting his claim of self-defense. Because Terrell has not shown that the result of the trial would have been different if he had been tried separately, the trial court did not abuse its discretion in denying the motions to sever. See *Slaton v. State*, 303 Ga. 651, 654 (3) (a) (814 SE2d 344) (2018) (no abuse of discretion in denying motion to sever where appellant was able to

present his defense to the jury and there was nothing to suggest the outcome of his trial would have been different had he been tried separately); *Krause v. State*, 286 Ga. 745, 750 (5) (691 SE2d 211) (2010) (trial court did not abuse discretion in denying motion to sever where "the joint trial did not present a significant likelihood of confusion of the evidence and law, or the possibility that evidence introduced against [one defendant] might be improperly considered against [the other defendant]").

5. Terrell claims that his trial counsel was ineffective for failing to again renew his motion to sever after his co-defendants' opening statements and sometime during the course of trial. We are unpersuaded.

To prevail on this claim, Terrell must prove both that his counsel's performance was professionally deficient and that he was prejudiced by that deficient performance. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Terrell must show that counsel "performed at trial in an objectively unreasonable way

considering all the circumstances and in the light of prevailing professional norms." *Collins v. State*, ___ Ga. ___, ___ (8) (864 SE2d 85) (2021) (citation and punctuation omitted). This showing "requires a defendant to overcome the strong presumption that trial counsel's performance was adequate." Id. (citation and punctuation omitted). "Reasonable trial strategy and tactics do not amount to ineffective assistance of counsel." *DeLoach v. State*, 308 Ga. 283, 287 (2) (840 SE2d 396) (2020) (citation and punctuation omitted). To prove the prejudice prong, Terrell "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (citation and punctuation omitted). If Terrell fails to show either prong of the *Strickland* test, we need not examine the other prong. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

At the motion for new trial hearing, trial counsel testified that he may have agreed to file the initial motion to sever at Terrell's request because he generally likes to have co-defendants to blame at trial. He explained that after filing an unsuccessful motion to sever,

26

he would usually renew the motion only if something occurred during trial that merited a mistrial: "[S]omething really dramatic has to happen for me to go back and renew [a] severance motion. . . . It has to be tantamount to a mistrial. I'm not going to keep asking for severances." In denying Terrell's motion for new trial on this ground, the trial court concluded that counsel was not deficient for failing to renew the motion to sever mid-trial, "as that was a course of action a reasonable attorney was entitled to choose."

"Generally, the failure to file a motion to sever does not require a finding of ineffective assistance since the decision whether to seek severance is a matter of trial tactics or strategy, and a decision amounting to reasonable trial strategy does not constitute deficient performance." *DeLoach*, 308 Ga. at 289 (2) (a) (citation and punctuation omitted). Here, Terrell points to nothing that occurred during the course of trial that would have supported a third motion to sever on grounds not already denied. Moreover, for the reasons stated above in Division 4, the trial court did not abuse its discretion in denying the first two motions to sever and would have acted

27

entirely within its discretion to deny a third motion to sever during trial on the same grounds. Cf. *Hill v. State*, 310 Ga. 180, 190 (6) (850 SE2d 110) (2020) ("Because the trial court would have acted within its discretion in denying a motion for mistrial, the failure of [Appellant]'s trial counsel to make a motion that the court was authorized to deny does not establish ineffective assistance by that counsel." (citation and punctuation omitted)). Accordingly, the trial court did not err in denying this claim of ineffective assistance of counsel.

6. In his final enumeration of error, Terrell asserts that the combined prejudicial effect of the trial court's errors and counsel's error require a new trial under *State v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020) (to establish cumulative error, a defendant must show that "at least two errors were committed in the course of the trial[, and] considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [the defendant] a fundamentally fair trial" (citation and punctuation omitted)). However, we have only assumed that an error occurred in

28

Division 2 above, so Terrell cannot show any combination of errors. This enumeration of error necessarily fails. See *Heade v. State*, 312 Ga. 19, 29 (5) (860 SE2d 509) (2021); *Flood v. State*, 311 Ga. 800, 808-09 (2) (d) (860 SE2d 731) (2021) ("[W]hen reviewing a claim of cumulative prejudice, we evaluate only the effects of matters determined to be error rather than the cumulative effect of non-errors." (citation and punctuation omitted)).

7. Although Terrell does not raise the issue on appeal, we have identified a merger issue in his sentencing. See *Dixon v. State*, 302 Ga. 691, 696-97 (4) (808 SE2d 696) (2017) ("We have the discretion to correct merger errors sua sponte . . . because a merger error results in an illegal and void judgment of conviction and sentence."). With respect to Matthews, Terrell was charged with and found guilty of aggravated assault with a deadly weapon (Count 3) and felony murder (Count 2) predicated on that same aggravated assault, i.e., "shooting her with a firearm." "[W]here, as here, the defendant is found guilty of both felony murder and the underlying felony, that underlying felony merges into the felony murder

29

conviction." *Jackson v. State*, 310 Ga. 224, 229 (2) (c) (850 SE2d 131) (2020) (citation and punctuation omitted). We therefore vacate Terrell's conviction and sentence for Count 3. See id.

*Judgment affirmed in part and vacated in part. All the Justices concur.*

Decided February 1, 2022.

Murder. Fulton Superior Court. Before Judge Glanville.

*Strickland Webster, Sydney R. Strickland*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, William C. Enfinger, Assistant Attorney General*, for appellee.