**THIRD DIVISION
DOYLE, P. J.,
HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**June 3, 2024**

# In the Court of Appeals of Georgia

A24A0006. GOODWIN v. THE STATE.

DOYLE, Presiding Judge.

Following a jury trial, Richard Goodwin was convicted of second degree homicide by vessel for violating the rules of the road for boat traffic, specifically failing to give way to another vessel;[1] violating the rules of the road for boat traffic, specifically failure to give way and attempt to pass another vessel;[2] and second degree homicide by vessel for violating the rules of the road for boat traffic, specifically running a vessel within 100 feet of another vessel.[3] The trial court denied his motion

---

[1] See OCGA §§ 52-7-18 (b); 52-7-12.2 (c).

[2] See OCGA § 52-7-18 (b).

[3] See OCGA §§ 52-7-18 (g); 52-7-12.2 (c).

for new trial, and Goodwin appeals, arguing that his trial attorneys were ineffective. For the reasons that follow, we affirm.

Viewed in favor of the verdict,[4] the record shows that on the clear afternoon of August 10, 2019, Goodwin and Cheryl Shepard were visiting Lake Allatoona. The two went out on a jet ski, and the lake was not heavily traversed at that time. Also on the lake that day were Allison, Jessica, and Michael Goodman, who had rented a Bayliner ski boat for the day. Michael piloted the boat around the lake, eventually passing by the Little River Marina in a no wake zone going an appropriate speed.[5] About that time, Goodwin and Shepard launched the jet ski from the public boat ramp that was located directly across from the marina. Just south of the marina, after exiting the no wake zone, the two vessels collided, sending Shepard and Goodwin off the jet ski. An unconscious Shepard was taken from the water by two passing paddleboarders,[6] and

---

[4] See *Mitchell v. State*, 255 Ga. App. 585 (565 SE2d 889) (2002), citing *Jackson v. Virginia*, 443 U.S. 307, 318-319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[5] A no wake zone is an area in a waterway in which a boater is required to use the minimum speed or power that allows for forward motion of the vessel without causing waves to form behind the vessel in order to avoid accidents in locations of heavy traffic or other hazards.

[6] The paddleboarders noticed the boat drive by them and heard the accident, but they did not see how it occurred.

Goodwin and Allison performed CPR while Jessica called 911. While rendering aide, one of the paddleboarders saw a life jacket wrapped around the boat propeller.

Eventually, first responders arrived via a rescue vessel to transport Shepard back to land, but she did not have a pulse or other signs of life at that time. Instead of boarding the rescue boat, Goodwin drove his jet ski back to the public boat ramp, where he was met by first responders and was transported to a hospital. At that time, Goodwin told an officer that the boat made a 45 degree turn and hit him. The officer also observed damage to the rear port side of the jet ski. Michael drove the boat back to the marina. Upon arriving at the shore, Shepard was transported to a local hospital where she was pronounced dead.

Shortly after the accident, Corporal Bart Hendrix, a Georgia Department of Natural Resources ("DNR") officer, arrived on the scene to lead the investigation. Hendrix instructed other law enforcement to get statements from Michael and his daughters, and Hendrix inspected the Goodmans' boat. The Goodmans' versions of events were that Michael drove the boat straight on to the lake past the marina, they did not see the jet ski prior to the collision, and the jet ski collided with them on either

3

the starboard side or stern of the boat. Michael and Allison also accompanied a DNR officer to the approximate location of the collision on the lake.

During his initial inspection of the boat, Hendrix observed a twisted bathing suit top around a life jacket that was identified as Shephard's, and when he raised the engine propellor from the water, fibers from the swimsuit and life jacket were discovered on it. Hendrix also inspected the jet ski, noting damage on the rear port side of the vessel around the location of the foot rests. After a lengthier inspection of the vessels a few weeks later, Hendrix opined that two screw heads on the rear port side of the jet ski matched two scrape marks along the starboard side of the ski boat near the bow.

On the day of the incident, an investigator with the Cherokee County District Attorney's office went to the hospital to assist with Hendrix's interview of Goodwin, and while waiting on Hendrix to arrive, according to the investigator, Goodwin spontaneously told him that

> he had put in at the boat launch across from the marina and was — was traveling through a no wake zone, didn't see any other boats, started accelerating out of the no wake zone, and was struck, what he described as on the left side of his ski. Never saw the boat, and didn't know where it came from.

Hendrix did not make it to the hospital to interview Goodwin that day, but the next day did so, and Goodwin told Hendrix that he had not seen any boat prior to the collision and that the boat struck him from behind. Goodwin also explained to Hendrix that he had a lot of experience with jet skis, practiced routine procedure for safely exiting a no wake zone in order to avoid getting run over by any boats, and had excellent eyesight on the water.

After the incident, an employee of the marina who had been working the day of the collision and was familiar with the appearance of the two vessels, checked the marina's surveillance videos from the time of the collision. The employee first followed the rescue vessel in the videos to pinpoint the location of the collision, and then rewound the videos until he was able to find the vessels passing by the marina in the no wake zone. The videos were preserved for Hendrix and later were played at trial in both the original version and in an enhanced format.

The enhanced videos show the boat slowly heading past the marina out onto the lake and slowly accelerating, the jet ski can then be seen traveling toward the boat from behind, quickly accelerating out of the no wake zone. The portion of the videos that show the collision are very difficult to see, but a viewer can make out the boat as it

makes a slow turn to the starboard side outside of the no wake zone and then see as the jet ski quickly moves toward the boat from behind.

The investigator testified that the videos were inconsistent with Goodwin's statement to him because Goodwin said no other boats were visible before the collision, and the videos show at least two vessels very close to the jet ski as it launched from the ramp, and the Goodmans' boat is clearly just in front of the jet ski as it is accelerating out of the no wake zone. He testified that the jet ski appeared to be jumping on the waves in the boat's wake. Hendrix testified that the videos showed that neither vessel appeared to slow prior to the collision, and the videos were inconsistent both with Goodwin's version of events and Michael's version — he had stated that he was traveling straight, but the videos show a sweeping right turn. Although Michael stated that he thought the jet ski hit the stern of the boat, the physical damage was to the starboard bow area of the boat.

Based on the evidence, both Michael and Goodwin were charged with second degree homicide by vessel and the related violations of the rules of the road of boating, and both men pleaded not guilty. Prior to trial, Goodwin moved to admit the

statements of both defendants, to which motion Michael agreed. Neither party moved to sever the case, and both parties presented expert witnesses at trial.

At the close of evidence, the jury acquitted Michael of all charges against him, and Goodwin was found guilty on all charges. Goodwin was sentenced to 12 months to serve 30 days in incarceration. He then filed a motion for new trial, which he later amended. After a hearing, the trial court denied the motion, and this appeal followed.

Goodwin raises two claims of ineffective assistance of trial attorneys.

To prevail on th[ese] claim[s], [Goodwin] must prove both that his counsel[s'] performance was professionally deficient and that he was prejudiced by that deficient performance. To prove deficient performance, [Goodwin] must show that counsel[s] performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. This showing requires a defendant to overcome the strong presumption that trial counsel[s'] performance was adequate. Reasonable trial strategy and tactics do not amount to ineffective assistance of counsel. To prove the prejudice prong, [Goodwin] must show that there is a reasonable probability that, but for counsel[s'] unprofessional errors, the result of the proceeding

would have been different. If [Goodwin] fails to show either prong of the *Strickland*[ *v. Washington*][7] test, we need not examine the other prong.[8]

1. Goodwin first contends that his trial attorneys were ineffective for failing to move to sever the trial.

OCGA § 17-8-4 (a) provides that, when two or more defendants are jointly indicted for a felony where the State does not seek the death penalty, such defendants may be tried jointly or separately at the discretion of the trial court. The relevant factors in ruling on a motion to sever are: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses. To show error in the denial of a motion to sever, the defendant bears the burden of establishing that a joint trial was so prejudicial as to amount to a denial of his right to due process. Also, [the Georgia Supreme Court has] explained that the mere presence of antagonistic defenses or possibility that a separate trial would give a defendant a better chance of acquittal is insufficient to show an abuse of discretion.[9]

---

[7] 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

[8] (Citations and punctuation omitted.) *Terrell v. State*, 313 Ga. 120, 130 (5) (868 SE2d 764) (2022), quoting *Collins v. State*, 312 Ga. 727, 744 (8) (864 SE2d 85) (2021), and *DeLoach v. State*, 308 Ga. 283, 287 (2) (840 SE2d 396) (2020).

[9] (Citations and punctuation omitted.) *Terrell*, 313 Ga. at 129 (4), quoting *Smith v. State*, 308 Ga. 81, 85 (2) (839 SE2d 630) (2020), and *Marquez v. State*, 298 Ga. 448, 450 (2) (782 SE2d 648) (2016).

We discern no error in the trial court's finding as to the amended motion for new trial that trial attorneys' failure to move to sever the case did not constitute ineffective assistance. First, Michael's defense was not inherently contrary to Goodwin's defense.[10] That is, the jury could have found both that Goodwin and Michael violated different rules of the road of boating that resulted in the accident. It was not required for the jury to find Michael guilty in order to acquit Goodwin, and vice versa. Moreover, the State indicted both men because it believed that both men committed infractions that resulted in Shepard's death, however inadvertently, not because the State wanted each defendant to prove a case against the other. The State presented ample testimony and evidence against both Goodwin and Michael, including testimony from the investigating officers and the video from the marina.

Trial attorneys may not have testified that they recalled discussing the option of severance with Goodwin or each other, but in response to the State's question about whether he had considered or spoke to the trial attorneys about moving to sever the case, Goodwin's original attorney testified that

---

[10] See *Terrell*, 313 Ga. at 129 (4).

[he and the trial attorneys] talked about the transfer of the case, I probably talked about [moving to sever the trial] a little bit. I certainly had considered it, and probably would have moved to sever, but there was a risk involved in a motion to sever, in my opinion, and that was which trial would go first. If the — if the trials were severed, I would certainly want to be the first defendant to be tried, so . . . I wasn't sure how it was going to play out. This is — I've never been involved in a trial that was brought — where the charges were brought in the way you brought them.

Moreover, at the pretrial motions hearing, one counsel argued that the State should not be allowed to admit evidence of similar transactions against Goodwin because he did not intend to raise a defense of accident, and in response to the trial judge's clarifying question that "you aren't going to say it was an accident at trial," counsel responded "Someone's at fault. Not my client."

Blaming Michael for the accident and highlighting that his statements to the officers were contrary to his maneuvering of the vessel as depicted on the video was the lynchpin of Goodwin's attorneys' trial tactic, and if they had moved for severance, this tactic may not have been as impactful.[11] That it did not have the intended result

---

[11] See, e.g., *Wells v. State*, 307 Ga. 773, 777 (4) (838 SE2d 242) (2020) (explaining that the question of whether to seek a severance of trial is a matter of strategy, and it was not objectively unreasonable to forgo filing a motion in a case in

10

or that another attorney may have made another choice is not the metric we apply in determining whether assistance is ineffective.[12] The trial court found in its review of trial attorneys' performance that they performed well in thoroughly cross-examining antagonistic witnesses, presented helpful expert testimony that blamed Michael's actions for the accident and disputed that Goodwin violated any boating rules, and overall performed well defending Goodwin; the record supports these findings.[13] Accordingly, this enumeration is without merit.

which the defendant hopes to deflect blame to the other codefendants). Moreover, it is at the trial court's discretion whether or not to grant a motion to sever, and had one been sought, Goodwin "would have had the burden of making a clear showing of prejudice and a denial of due process in the absence of severance." (Punctuation omitted.) *Green v. State*, 302 Ga. 816, 819 (2) (b) (809 SE2d 738) (2018).

[12] See *Jones v. State*, 292 Ga. 593, 601 n.7 (7) (d) (740 SE2d 147) (2013) ("That the lawyer failed to articulate any strategic reasons for his failure to object makes no difference. A proper assessment of the performance of counsel 'calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.'"), quoting *Harrington v. Richter*, 562 U. S. 86, 110 (IV) (A) (1) (131 SC 770, 178 LE2d 624) (2011).

[13] We need not address the issues raised by Goodwin as to the second prong of the *Strickland* test because we discern no evidence of deficient performance. See *Terrell*, 313 Ga. at 130 (5).

11

2. Goodwin also argues that trial attorneys were ineffective for failing to object to Michael's expert witness's testimony that Goodwin maintains addressed the ultimate issue.

"'Ordinarily, a witness may not express his opinion as to an ultimate fact, because to do so would invade the province of the jury.'"[14] Specifically, Goodwin takes issue with the following testimony provided by Michael's expert witness:

> in this situation, the vessel that is doing the overtaking, or the give-way vessel, the one in back, is obligated to keep out of the way of the vessel that they're passing. . . . And then another fun part of that law is that any alteration, so once you're in an overtaking situation, the vessel that's the give-way vessel, the one that's doing the passing, is obligated by law to not get in the way even if their bearings change relative to one another. So once it's an overtaking situation, they are obligated to stay clear of the vessel that they're passing.

The expert goes on to testify that "[i]n fact, what the Bayliner was doing was completely proper. . . . [The rules of the road of boating] make it very, very clear, that if you are the give-way vessel, and in this case, in an overtaking case, it's the guy in the back. You have to take early and substantial action to keep well clear."

---

[14] *Batten v. State*, 295 Ga. 442, 445 (3) (a) (761 SE2d 70) (2014).

Prior to the expert testifying on this matter, however, a DNR officer testified about the different possible positions of the boat and jet ski and the applicable rules for overtaking another vessel and giving way to another vessel in addition to other boating rules which could have applied and which vessel would have been at fault in each circumstance. And Hendrix also testified about the rule, his belief about the accident, and his opinion that both Goodwin and Michael violated different boating rules. Moreover, Goodwin's own expert testified about rules of overtaking and crossing vessels and about his opinion that Michael violated both the crossing rules and the 100-foot rule.[15]

Pretermitting whether Michael's expert's testimony invaded the ultimate issue, based on the testimony provided by lay witness law enforcement officers regarding potential violations made by each vessel,[16] to which Michael's expert's testimony was

---

[15] Michael's attorney objected during this expert's testimony and was overruled by the trial court. Thus, objecting to Michael's expert did not present a likely scenario in which the objection would have been sustained. Cf. *Sowell v. State*, 327 Ga. App. 532, 540 (4) (a) (759 SE2d 602) (2014) ("minimizing objections in an effort to show the jury that the defense had nothing to hide was sound strategy").

[16] See, e.g., *Taylor v. State*, 315 Ga. 630, 641-642 (4) (b) (884 SE2d 346) (2023) (explaining that an officer's opinion of the evidence did not violate OCGA § 24-7-704 because it was lay opinion).

cumulative, and Michael's overruled objections to Goodwin's own expert's testimony as to this matter, trial attorneys' failures to object to Michael's expert in this instance was not harmful to Goodwin.[17] By not objecting, trial attorneys avoided highlighting the testimony for the jury. Moreover, "[t]hat alternative counsel would have questioned witnesses differently does not approach ineffective assistance of counsel. Trial strategy and tactics do not equate with ineffective assistance."[18] Accordingly, this enumeration is without merit.

3. Finally, to the extent that Goodwin attempts to raise in a single footnote a separate argument that the combination of errors at trial resulted in ineffective assistance of counsel, his efforts are insufficient to enumerate such argument as

---

[17] See *Pepe-Frazier v. State*, 331 Ga. App. 263, 270-271 (3) (a), (b) (770 SE2d 654) (2015) (rejecting claims of ineffective assistance based on counsel's failure to object to testimony that was cumulative of other admissible evidence).

[18] (Citation and punctuation omitted.) *Batten*, 295 Ga. at 445 (3) (b).

error.[19] And in any event, based on the holdings of Divisions 1 and 2, this argument fails.[20]

*Judgment affirmed. Hodges and Watkins, JJ., concur.*

---

[19] See, e.g., *Howard v. State*, __ Ga. __ (2) n.2 (Case No. S24A0105, decided Mar. 19, 2024), citing *Mims v. State*, 310 Ga. 853, 854 n.2 (854 SE2d 742) (2021) ("An appealing party may not use its brief to expand its enumeration of errors by arguing the incorrectness of a trial court ruling not mentioned in the enumeration of errors.").

[20] See, e.g., *Cox v. State*, 306 Ga. 736, 743 (2) (e) (832 SE2d 354) (2019) (explaining that if the appellate court is reviewing a claim of cumulative error in the context of ineffective assistance of counsel, the court should "evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors") (punctuation omitted). Contrary to the claim made by Goodwin, *Cox* does not stand for the proposition that this Court is *required* to evaluate the combined effect of the alleged instances of ineffective assistance of counsel in the event that multiple instances are raised by a defendant. This Court reviews the claims raised by a defendant in their enumerations of error. See *Mims*, 310 Ga. at 854 n.2.